760 So.2d 591 (2000)
STATE of Louisiana, Appellee,
v.
Timothy Ray HUDSON, Appellant.
No. 33,357-KA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 2000.
*593 Louisiana Appellate Project by Amy C. Ellender, Counsel for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Allen Harvey, Assistant District Attorney, Counsel for Appellee.
Before CARAWAY, PEATROSS & SAMS (Pro Tempore), JJ.
PEATROSS, J.
Defendant, Timothy Ray Hudson, was charged with one count of second degree murder for the February 1997 death of Cedric Williams. Following a bench trial, Defendant was found guilty of the lesser and included offense of manslaughter, a violation of La. R.S. 14:31, punishable by imprisonment at hard labor for not more than 40 years. The trial court sentenced Defendant to serve 40 years at hard labor and denied his timely motion for reconsideration of sentence. Defendant urges that the evidence was insufficient to sustain his conviction in that it did not disprove his claim of self-defense and that his sentence is excessive. For the reasons stated herein, Defendant's conviction and sentence are affirmed.

FACTS
On February 10, 1997, at about 2:00 a.m., Ouachita Parish Sheriffs Deputy Martin Evans was on patrol when he noticed a fire in a rural area near Cheeks Road.[1] Deputy Evans was not able to extinguish the fire, so the fire department was called to the scene. After the fire had been extinguished, it became apparent that the burning matter was the body of a black male.[2]
Marchel Allen, maintenance supervisor for the Monroe City Schools, and the victim's father, Brian Williams, identified the body as that of Cedric Williams, age 34. Mr. Allen testified at trial that he had known the victim for 26 years. The victim was employed by Century Protection as a security systems salesman and worked at a second job as a florist. During the investigation, Mr. Allen told Deputy Renee Smith, the on-call investigator who responded to the scene of the burning body, that he had talked to the victim on the night prior to the body being found. Mr. Allen then testified at trial that at about 10:00 p.m. on the night of the homicide, the victim called Mr. Allen at his house and they discussed a friend, Robert Staten, who was near death in a hospital. Mr. Allen has "caller ID" and noted that the victim was calling from Defendant's telephone. Authorities determined from the caller ID Defendant's West Monroe address and Deputies Smith, Brooks and Hallbrooks went to Defendant's home. As the police drove up, Defendant was throwing carpet onto the ground outside his trailer. When Defendant saw the police, he went inside and shut the door.
*594 In response to preliminary questions, Defendant told the police that he knew the victim and had last seen him at approximately 6:00 p.m. of the preceding day. Defendant voluntarily allowed the deputies into his trailer and granted them permission to search. When deputies entered the trailer, they smelled the strong odor of cleaning fluids and found blood in the doorway on the carpet area. Deputies also found a bloodstained mattress in one of the bedrooms. Deputy Brooks took a receipt from Georgia Carpet, a carpet retailer, that was on top of some carpet lying outside the trailer. The receipt indicated that Defendant had purchased carpet on February 10, 1997, at 11:38 a.m.
Defendant agreed to accompany the deputies to the sheriffs office for further questioning. At the sheriffs office, Defendant voluntarily signed a waiver of rights form, without benefit of any promises. In two subsequent statements to deputies, Defendant provided several versions of what had happened: (1) he had only seen the victim for a few minutes on the evening before the body was found; (2) Defendant had shot the victim, but the victim had left under his own power; and (3) Defendant had shot the victim in self-defense after being raped.
During his first statement, Defendant told Deputy Brooks that he last saw the victim at approximately 8:30 p.m. on the preceding evening at Defendant's house. The victim had arrived at Defendant's house at 4:00 p.m. and said that he wanted to visit a friend in the hospital. Defendant helped the victim make a fruit basket for the sick friend and accompanied the victim to St. Francis Hospital. Defendant said he thought that the sick friend had AIDS. On the way home from the hospital, the victim told Defendant he wanted to "do" him.
According to this statement of Defendant, however, the victim dropped Defendant off at his house and left. Defendant then left his trailer, bought fast food and returned home. The victim returned to Defendant's house between 8:00 p.m. and 8:30 p.m. and started telling Defendant what sexual things the victim wanted to do with him. Defendant said he told the victim to leave, but he grabbed Defendant from behind and a struggle ensued. The victim held Defendant down with one hand while the victim took off his pants and shoes. According to Defendant, the victim then tried to take Defendant's clothes off and, apparently, partially succeeded; but Defendant got away, ran into a bedroom, obtained a pistol and shot the victim. Defendant stated that the shot probably was in the stomach area. Defendant said, "I meant to kill him," because the victim had tried to have sex with him. Defendant also stated that he thought the victim was going to kill him after the gunshot because the victim kept coming at Defendant with a glazed look in his eyes.
Also in this statement, Defendant maintained that he fired only one shot, and that was in the trailer. The victim then walked out of the trailer and drove away, wearing only his white t-shirt and striped boxer shorts. According to this first statement, Defendant never saw the victim again. Regarding his replacement of the carpet, Defendant stated that he had been planning to replace the carpet anyway. He advised that the bloody rags used to clean up the mess were in the trash, the gun was in the closet and the victim's pager was on a dresser.
In this statement of Defendant, the sexual act which he described to Deputy Smith had nothing to do with penetration. In fact, he described it as "groping." Defendant did not relate anything to deputies about being raped or penetrated by the victim himself or by any device utilized by him.
After Defendant gave this statement, the police obtained a search warrant for Defendant's trailer. During that search, Deputy Smith found four spent casings in the front yard near the trailer. The caliber matched the weapon and a box of *595 ammunition found in Defendant's bedroom. The search also revealed one bullet hole inside the trailer, in the north wall of the south end bedroom. There was new carpet in the bedroom, with blood on the edges and under the carpet. There were two spent rounds in the victim's car. In addition, negatives of photographs of a wedding and a black man's genitalia were found in Defendant's trash can.
Defendant was arrested and charged with second degree murder after giving the above described statement. Following his arrest, Deputy Brooks again advised Defendant of his rights and took a second statement, which was recorded. The second statement was taken 64 minutes after the first statement. In the second statement, Defendant told a different version of events, with the following notable changes. Defendant added that, when Defendant and the victim arrived at the hospital, Defendant determined that the victim was homosexual. The victim went to the sick friend, kissed him and talked "like gay guys talk." On the return trip to Defendant's house, the victim admitted he was homosexual. Defendant next added that, after he returned from getting his fast food dinner, he put on his night clothes (sweats) and paged the victim to talk about security systems. The victim returned to Defendant's house between 8:45 p.m. and 9:00 p.m., sat down and started rubbing Defendant's back. When Defendant went toward the bedroom, the victim got up and grabbed Defendant with a "full nelson." They struggled and the victim threw Defendant to the ground. The victim then took off his shirt, pants and shoes while holding Defendant down on the floor.
Defendant got away from the victim and went into the bedroom to get a gun. Significantly departing from his first statement, Defendant stated that he shot the victim twice in the front part of his body while he was coming down the hall. Defendant shot the victim again in the back when the victim fell across the bed. Defendant told Deputy Brooks that he believed that the victim was on drugs and was going to kill him. At that point in his statement, Defendant admitted, "I think I shot him in the head." Defendant agreed he fired four rounds into the victim from a.380 pistol. The pistol originally had only three rounds in it. Defendant stated that he:
had to put another bullet in there while [victim] was on the bed and I shot him in the back, so while I was putting that bullet in there, I dropped one on the floor ... I thought he was gonna kill me... `cause I started to run but I got the bullet in the gun so I went back and I shot him in the head and that's when I killed him.
Defendant further stated that he "couldn't go to the cops because it was murder" and he was "ashamed of what happened." Defendant next described how he tied an extension cord around the victim to pull him out of the trailer. Defendant used the victim's car to transport the body to the dump. At the dump, Defendant poured lighter fluid on the body, started it on fire and left it to burn. He stated that he abandoned the car at a church and jogged home.
After Defendant was transported to jail and booked, he consented to another search of his trailer. The police seized the clothes Defendant said he was wearing at the time of the homicide, the victim's pager and some paneling which had a bullet hole in it.
Deputy Brooks then re-interviewed Defendant, again advising him of his rights. In this statement, Defendant said he fired the first shot between the bathroom and the spare bedroom in the hallway. The second shot was between the door to the farthest bedroom and the bathroom. Both shots went into the victim's upper torso. The third shot was in the victim's back after he had fallen on the bed. Defendant further stated that the fourth shot was to the victim's head.
*596 No "rape kit" protocol was performed because Defendant never indicated that he was touched by a penis in any way on any part of his body. Although Defendant said he called the victim's act of trying to take his clothes off and to have sex with him "rape," Defendant never communicated anything to indicate that he actually had been raped by the victim.

Trial testimony
At trial, Dr. Steven Hayne was accepted as an expert in forensic pathology. Dr. Hayne testified that the victim had a green electric cord around his neck and another around his waist/upper hips. Due to the victim's obesity, he burned at a high temperature to near incineration of the lower extremities. There were two gunshot wounds to the body; one in the back, 24 inches below the top of the head, and one on the right side of the head in front of the ear. The wound to the back would have been fatal, having gone through the liver, small bowel and kidney. It would have been a slow death by bleeding. The second wound was a contact wound and would also have been fatal. The weapon was placed directly against the skin surface.
Dr. Hayne further testified that, in addition to being morbidly obese, the victim had an enlarged heart, coronary artery disease and elevated levels of cholesterol. These are indicators of hypertensive heart disease. In Dr. Hayne's opinion, the victim "would not be able to sustain moderate to moderately severe physical activity for any great length of time."
Dr. Hayne could not determine if there were other gunshot wounds to the body because the lower extremities, part of the back and the abdominal wall had burned away. He did opine, however, that the back wound would not have immediately incapacitated the victim.
Rhonda Fowler, a Ouachita Parish Sheriff's investigator, testified that she photographed the caller ID box at Marchel Allen's house. She also took pictures of the injuries to Defendant's body, which included a scratch on his face, on his shin and on his forearm.
Lt. Gregory testified regarding the items found in the victim's car. Photographs taken of the car when it was impounded revealed blood on the rear seat and carpet in the trunk, a plastic bag containing a .380 cartridge case and a bloody pillow, pillow case and sheet. During the inventory of the car, the police also found condoms, one of which was on a sexual aid, commonly known as a dildo.
Troy Stracener of the DNA and serology section of the North Louisiana Criminalistics Laboratory was accepted as an expert by the trial court. Mr. Stracener tested Defendant's clothing and testified that there was no seminal acid phosphatase on any of the items, nor was there any on the "sexual aid with the condom on it." That item also did not bear any fecal matter. Mr. Stracener further testified that the blood on the "sexual aid with condom" was inconsistent with Defendant's blood, but was, however, consistent with the victim's blood.
David Yates was accepted as an expert in firearms identification. Mr. Yates testified that he compared a bullet fired from Defendant's pistol to the bullets recovered by the police and concluded that the bullets were fired from the same pistol.
Defendant testified at trial that he had known the victim, who sold security systems and floral arrangements, since approximately April 1996. According to his testimony, Defendant was trying to purchase a security system from the victim. He had also purchased a pistol for home protection. Defendant stated that the victim occasionally showed up at Defendant's house to show different kinds of security systems, but Defendant did not know how the victim found out where Defendant lived.
Defendant testified that, on February 9, the victim arrived at Defendant's house and asked Defendant to accompany him to the hospital. Defendant agreed and the *597 men went to the hospital in the victim's car. The victim had made a fruit basket for the friend in the hospital.
When the victim entered the hospital room, he hugged the sick friend and kissed him on the mouth. According to his testimony at trial, Defendant had not known at that point that the victim was homosexual, but had suspected it. On the way home from the hospital, the victim was talking about what kind of men he liked which, Defendant testified, made him uncomfortable. After the victim returned him to his trailer, Defendant testified that he put on his night clothes (sweats) and went out to get something to eat. He returned home, ate and began watching television.
Defendant further testified that the victim returned to Defendant's residence later that evening carrying a black pouch in his hand. The victim asked to use Defendant's telephone. Defendant agreed and continued watching television. After about ten minutes, he felt the victim touch him. Defendant told the victim to stop, but he did not comply. In this version of events, Defendant states that he had been standing up the whole time.
Again, Defendant testified that he told the victim to leave. Instead, the victim touched Defendant on his penis. When Defendant began backing away, the victim shoved him and he fell forward, knocking down a door. The men started wrestling. According to Defendant, the victim was taking off his clothes while he held Defendant down on the floor. Defendant managed to break free, but the victim caught him again and held him down. Defendant emphasized that the victim outweighed him by about 100 pounds. Defendant testified that the victim then told him, "if you don't stay still I'll have to kill you."
Defendant testified that the victim then pulled Defendant's pants down and sodomized him. When Defendant finally got away from the victim, Defendant kicked him and ran to the bedroom. Defendant got his gun; and, as the victim was coming down the hall saying, "what are you going to do with that you little bitch," Defendant testified that he fired the first shot, but did not know whether the bullet hit the victim. The victim kept moving toward Defendant and Defendant retreated into his bedroom. As the victim entered the bedroom, he tripped over the television and Defendant fired a second time. Defendant testified that, at that point, he was still afraid. As the victim was getting up off the bed, Defendant fired a third shot. According to Defendant's trial testimony, there was no escape for him at that point because the door to the outside, by the bathroom, had been bolted shut. Notably, there is no mention of the gunshot to the head in Defendant's direct examination testimony.
Defendant next testified that he went outside his trailer, but then returned to the bedroom and started to move the body. He admitted that he used an extension cord to drag the body out of the trailer. He then put the body in the car and removed most of the items from the trailer that had bloodstains, including clothes, towels, pillow cases, bed linen and the little black pouch. According to Defendant, the "sexual aid" was outside the pouch in the trailer when he found it.
Defendant testified that the victim was clothed only in a t-shirt at that time. Defendant dumped the body, threw some of the clothes on it and set it on fire. He testified that he abandoned the car at a nearby church and went back home. The next morning, Defendant purchased new carpet "just to cover the bedroom ... just to try to hide the blood."
On cross examination, Defendant was questioned regarding inconsistencies between the various statements he had given to authorities and his testimony at trial. First, when asked about the discrepancy in saying Defendant did not know that the victim was homosexual and that the victim was always saying he was homosexual, Defendant said he did not remember making the latter statement. Second, although Defendant's second statement included *598 that he had paged the victim at 8:00 p.m. on the night of the homicide, at trial, Defendant could not remember doing that. Third, Defendant did not remember making any statements to the police about the victim when the police first arrived at Defendant's trailer following the homicide. Fourth, although the statements differed about whether the victim held Defendant against a wall, Defendant could not remember the wall. Fifth, Defendant could not remember telling the police that the victim had driven away with blood coming out of his stomach. Defendant could not remember telling the deputies, in a recorded statement, that the victim had started begging after being shot, saying, "please don't." Defendant did, however, remember making an earlier statement that he went into the yard to shoot the victim again when he was attempting to leave.
When first questioned about injuries he received, Defendant agreed that he mentioned a scratch on his arm and on his leg. He had not mentioned a scratch near his eye, even though he had testified that he had such a scratch. Defendant also agreed that he never made any statement to the police about the black pouch, the sexual aid, the sodomy or about being called "bitch" by the victim.
Defendant's testimony regarding the gunshot wound to the victim's head was unclear. Defendant was not certain whether he shot the victim in the head, but he testified that it probably occurred when the victim was getting up off the bed. Defendant could not remember whether or not the victim was facing him at the time the victim was shot in the head. Defendant agreed that he reloaded the pistol before shooting the victim in the head. When asked to confirm that he had reloaded between shooting the victim in the back and the head, Defendant could not remember when he reloaded. He later admitted that he reloaded with a bullet from a box he kept in a drawer in the bedroom and that it only took him a few seconds to reload while the victim was trying to get up off of the bed. Defendant also agreed that he told the deputies he had started to run, but he got the bullet in the gun and "went back" and shot the victim in the head. Defendant further agreed that he had the ability to run out of the room at that point. Defendant's testimony confirmed that the victim had never been in the trailer before the night of the homicide and that Defendant had never been in the victim's house, although he had stood outside the door to get a security system pamphlet.
Several witnesses testified on behalf of Defendant regarding his non-violent personality and good character. Kristina Hernandez testified that she had worked with Defendant at McDonald's restaurant[3] for a year and a half and that he showed an interest in women. She also testified that Defendant was not a violent person.
Carol Tefteller also worked with Defendant at McDonald's. She testified that he never acted violently. According to Ms. Tefteller, Defendant was respected by his co-workers, courteous to customers and appeared to be heterosexual. She also testified that Defendant was in good physical condition.
Brandy Odom testified that she worked for Defendant at McDonald's. Ms. Odom testified that Defendant "was altogether" and "kept everything together." He was a very clean and neat person and was never violent.
Several witnesses testified regarding the non-aggressive, non-violent nature of the victim. James Burrell, Jr., testified that the victim did not have a reputation for violence. It was well known that he preferred men sexually. Everett Blakes testified that he knew Defendant and the victim. He also testified that the victim *599 was about 5'8", weighed 250 to 300 pounds and was not physically fit. Mr. Blakes further testified that he and the victim had been inside Defendant's trailer three or four times and that Defendant had been inside the victim's mother's home during a wedding in December.[4]
Duane Humphries testified that he had known the victim for 12 years and that the victim had worked for him. The victim did not have a reputation for violence; he never did any act of violence or aggression. Mr. Humphries confirmed that the victim was so physically out of condition that a 50-foot walk would leave him "panting out of breath."
In rendering its verdict, the trial court indicated that it was not convinced there was a rape on the night of the homicide. Since Defendant told so many versions of what happened, his credibility was "not high, to say the least." The trial court noted that Defendant had an opportunity to escape before shooting the victim in the back and that Defendant admitted that the victim had begged Defendant to stop after being shot twice in the stomach. The trial court found the act of holding the gun barrel to the victim's head to be unjustified. It indicated a very strong passion and a clear intent to kill. The trial court further noted that Defendant was quite fit and strong; otherwise, he could not have put the victim into the car and later unloaded the body. Additionally, the trial court noted that, although Defendant said the shooting occurred shortly after the victim arrived at about 9:00 p.m., the caller ID at Mr. Allen's home showed that the victim was still alive at 10:00 p.m. The trial court believed that there was a history of a relationship of some sort between the victim and Defendant, which Defendant sought to minimize. Regarding Defendant's wounds, the trial court found them to be as consistent with a cleanup effort as with a struggle and further found that the puncture wound was more consistent with a cleanup effort. While the trial court believed that the attempt to burn the body showed guilty knowledge, it found that such conduct was as consistent with manslaughter as it was with murder. The trial court found Defendant guilty of manslaughter.

DISCUSSION

Assignment of error no. 1: Sufficiency of the evidence

Although the record does not reflect that Defendant filed a motion for post-verdict judgment of acquittal pursuant to La.C.Cr.P. art. 821, this court will consider sufficiency arguments in the absence of such a motion. State v. Green, 28,994 (La.App.2d Cir.2/26/97), 691 So.2d 1273.
The standard for review is whether a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
Defendant concedes that he killed the victim. He contends, however, that the evidence failed to show he did not act in self-defense. He claims the victim had raped him and threatened to kill him if he did not stay still during the rape. Defendant asserts that the victim was acting aggressively and made Defendant believe he was in danger of great bodily harm. Defendant, who weighed 135-145 pounds, claims he was virtually trapped in the trailer and unable to flee from the victim, who weighed 225-250 pounds, without resorting to deadly force to protect his life.
The State argues that Defendant impeached himself with various versions of the events. Defendant also lied as to *600 whether he had been in the home of the victim's mother and whether he had allowed the victim into his trailer before the night of the homicide. The State also argues that the evidence of the victim's morbid obesity, heart disease and inability to sustain moderate physical activity makes it impossible to believe Defendant's claim that the victim held him down with one hand and disrobed himself and Defendant with the other hand prior to perpetrating a forcible sodomy. The State also points out that Defendant said he shot the victim in the back, which negates a claim of self-defense. After careful review of the record, we find sufficient evidence to rebut Defendant's claim of self-defense and sufficient evidence to support his conviction of manslaughter.
Manslaughter is a "homicide which would be [first or second degree murder], but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La. R.S. 14:31 A(1).
Self-defense is justification for a killing only if the person committing the homicide reasonably believes he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20(1); State v. Cotton, 25,490 (La. App.2d Cir.3/30/94), 634 So.2d 937; State v. Jones, 600 So.2d 875 (La.App. 1st Cir. 1992), writ denied, 92-2351 (La.5/12/95), 654 So.2d 346. The state has the affirmative duty of proving beyond a reasonable doubt that the killing was not in self-defense. State v. Arnold, 30,282 (La. App.2d Cir.1/21/98), 706 So.2d 578.
For a homicide to be justified, the offender must have had a reasonable belief he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary, under the circumstances, to save himself from that danger. La. R.S. 14:20(1); State v. Dozier, 553 So.2d 911 (La.App. 4th Cir.1989), cert. denied, 558 So.2d 568.
Factors to consider in determining whether a defendant had a reasonable belief the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing and the defendant's knowledge of the assailant's bad character. State v. Hardeman, 467 So.2d 1163 (La. App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. State v. Brown, 414 So.2d 726 (La.1982).
When a defendant in a homicide case claims self-defense, the state has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. State v. Garcia, 483 So.2d 953 (La.1986); State v. Flowers, 574 So.2d 448 (La.App.2d Cir.1991), writ denied, 580 So.2d 666 (La.1991).
Evidence of flight, concealment and attempts to avoid apprehension are relevant as indications of consciousness of guilt. State v. Davies, 350 So.2d 586 (La. 1977); State v. Morris, 521 So.2d 1214 (La.App. 2d Cir.1988), writ denied, 530 So.2d 80 (1988).
As previously stated, on review, the standard is whether a rational factfinder, after viewing the evidence in the light most favorable to the state, could have found beyond a reasonable doubt that the homicide was not committed in self-defense. Jackson v. Virginia, supra; State v. Matthews, 464 So.2d 298 (La.1985); State v. Ruff, 504 So.2d 72 (La.App. 2d Cir.1987), writ denied, 508 So.2d 64 (1987), writ denied, 508 So.2d 65 (1987).
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation underJackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a factfinder's decision to accept or reject *601 the testimony of a witness in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir. 1986), writ denied, 499 So.2d 83 (La.1987).
The State's case against Defendant rests on circumstantial evidence since there was no independent witness to the events in the trailer on the night of the killing. In all cases where an essential element of the crime is not proven by direct evidence, La. R.S. 15:438 applies. As an evidentiary rule, it restrains the factfinder in the first instance, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded. Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law. State v. Shapiro, 431 So.2d 372 (La.1982); State v. Hammontree, 363 So.2d 1364 (La.1978).
Here, the trial court did not believe Defendant's version of the events. Specifically, the trial court did not believe Defendant's claim that he was raped by the victim. Due to the varied versions of what Defendant claimed happened, we believe that the trial court was justified in discounting any and all of Defendant's selfserving testimony. Defendant conceded he committed the homicide. Even using his version of the facts, Defendant had a chance to get out of the trailer when the victim was face down on the bed. Defendant shot him in the back, admittedly with the intent to kill. The victim was not a threat to Defendant at that time. Defendant reloaded and fired a contact round into the victim. Clearly, there was not a struggle at that point. The victim was subdued to the point that Defendant could deliberately hold the pistol to the victim's head. Defendant attempted to destroy the evidence of the homicide, both by burning the victim's body and by cleaning the trailer with bleach and removing physical items bearing bloodstains which tend to prove guilty knowledge.
Thus, the evidence proved beyond a reasonable doubt that Defendant committed the homicide and did not act in self-defense. The evidence, viewed in the light most favorable to the prosecution, is sufficient to prove beyond a reasonable doubt that Defendant committed a homicide in sudden passion or heat of blood immediately caused by some provocation sufficient to deprive an average person of his self-control and cool reflection, even though no one but Defendant knows what was that provocation. The evidence proves beyond a reasonable doubt that Defendant did not act in self-defense and the evidence excludes any reasonable hypothesis of innocence. This assignment is without merit.

Assignment of error no. 2: Excessive Sentence

Defendant acknowledges that the trial court adequately stated for the record the considerations taken into account in formulating a sentence. Defendant argues, however, that his sentence is excessive because he had no prior criminal record; he was gainfully employed in a management position with McDonald's; and, at age 24, he was "fairly youthful" at the time of the homicide. Defense counsel suggests that, although Defendant's act of burning the victim's body was cruel, it was motivated by a sexual attack which caused Defendant to experience anger, shame and embarrassment.
Before imposing sentence, the trial court held a hearing. Defendant apologized to the victim's family and friends, as well as to his own family and friends. Defendant said that he was not a thug and that he had been living a decent life, saving money to attend school and working hard. Defendant said he was not a threat to society.
Geneva Burrell, a relative of the victim, made a sympathy-evoking statement to the trial court. She pointed out that the victim was afraid of guns and "had to have begged for his life." She asked for the maximum sentence.
The trial court observed that Defendant had no prior record, but found there was a need for correctional treatment and that a *602 lesser sentence would deprecate the seriousness of the offense. This was a serious offense because Defendant had a chance not to take the victim's life. There was no need to shoot the victim in the head. Defendant had the time to reload before firing that shot. The trial court found there was "uncommon brutality" in the nature of the killing. In mitigation, the trial court noted that Defendant had been working and had held a management position. He was well thought of by his employees. The trial court, however, found this manslaughter was among the worst ever seen. The only way it could be more serious was if Defendant had prior convictions for homicide. The trial court also found that an event, albeit of an unknown nature, "caused the killer to become angry, to have his blood heated, to be provoked, to be passionate." In aggravation, the trial court noted that Defendant had lied in his statements about being raped. Defendant had a chance to get away, but did not take it. The victim begged for mercy, but Defendant did not grant him any. The trial court then imposed a sentence of 40 years at hard labor with credit for time served.
In denying Defendant's motion for reconsideration of sentence, the trial court noted that this case is "among the worst possible manslaughter cases. The court completely rejects defendant's claim that he was raped by the victim. That is yet another of defendant's lies." The trial court further stated, "if any case merits the maximum sentence for manslaughter, where defendant was relatively young and had no prior criminal record, this one does." Finally, the trial court concluded that "defendant showed no mercy, and he deserved no mercy."
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C.Cr.P. art. 894.1. As noted above, the defense does not challenge the adequacy of the trial court's articulation of reasons for sentence.
The second inquiry involves a determination of whether the sentence imposed is too severe. This depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864.
A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, this court will not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Washington, 29,478 (La.App.2d Cir.4/2/97), 691 So.2d 345.
As a general rule, maximum sentences are appropriate in cases involving the most serious violation of the offense and the worst type of offender. State v. Grissom, 29,718 (La.App.2d Cir.8/20/97), 700 So.2d 541; State v. Walker, 573 So.2d 631 (La.App.2d Cir.1991).
Here, the reasons articulated by the trial court appear more than adequate to support the imposition of even this maximum sentence. Defendant acted with deliberate cruelty to the victim. Defendant could have escaped; but, instead, he took the time to reload his weapon and shoot the victim several times. On this record, we do not find constitutional error. The sentence does not shock the sense of justice or reflect purposeless or needless infliction of pain and suffering, nor do we find the sentence to be out of proportion to the seriousness of the offense.

Error Patent
Our error patent review disclosed that the trial court erroneously informed *603 Defendant that the prescriptive period for post-conviction relief is three years. The trial court omitted a statement to Defendant as to when the prescriptive period begins. The two-year prescriptive period does not begin to run until the judgment is final under La.C.Cr.P. art. 914 or 922; thus, prescription has not yet begun to run.State v. Harvey, 26,613 (La.App.2d Cir.1/25/95), 649 So.2d 783, writ denied, 95-0430 (La.6/30/95), 657 So.2d 1026, writ denied, 95-0625 (La.6/30/95), 657 So.2d 1028; State v. Mock, 602 So.2d 776 (La. App. 2d Cir.1992).
We direct the trial court to send to Defendant appropriate written notice of the proper prescriptive period for post-conviction relief and notice of when that prescriptive period begins within ten days of the rendition of this opinion and to file proof of Defendant's receipt of such notice in the record of the proceedings.State v. Mock, supra; State v. Smith, 600 So.2d 745 (La.App. 2d Cir.1992).

CONCLUSION
For the foregoing reasons, Defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The area, in western Ouachita Parish, is mostly woods. The fire was at a location used as a garbage dump.
[2] The details of this incident are gruesome. The trial testimony of expert witness Dr. Steven Hayne revealed that one shot had been fired into the victim's back, which alone would have been fatal. Another shot to the victim's head had been administered with the firearm placed in direct contact with the victim's head, which also alone would have been fatal.

Lucille Lynn, a crime scene technician, testified that she responded to the scene and made a videotape of the crime scene which was admitted into evidence and played for the court. Ouachita Parish Sheriff's Lt. Jim Gregory, a crime scene investigator, testified that he, too, went to the scene of the burned body. He took photographs of the crime scene which were admitted at trial. Ronnie Dever, an employee of the coroner's office, testified that he, also, responded to the crime scene. Mr. Dever testified that the body had been wrapped with electrical cords and set on fire. The body was sent to Jackson, Mississippi, for a forensic autopsy. Mr. Dever observed that the body had been burned front and back, mostly from the waist down. The body was burned to the point that the fingers fell off and the large leg bones were devoid of flesh. Mr. Dever made four crime scene photographs which were admitted into evidence.
[3] Defendant testified that, in February 1997, he was the assistant manager at the McDonald's restaurant on Well Road in Monroe.
[4] During his testimony, Defendant denied having been in the victim's mother's home.