775 So.2d 579 (2000)
STATE of Louisiana, Appellee,
v.
Emmie Petty NELSON, Appellant.
No. 34,077-KA.
Court of Appeal of Louisiana, Second Circuit.
December 6, 2000.
*581 Louisiana Appellate Project by Amy C. Ellender, Mixon Law Offices by James E. Mixon, J. Scott Sartin, Counsel for Appellant.
Richard Ieyoub, Attorney General, Iley H. Evans, District Attorney, Carl B. Duke, Jr., Assistant District Attorney, Counsel for Appellee.
Before BROWN, WILLIAMS and KOSTELKA, JJ.
KOSTELKA, J.
A unanimous jury convicted Emmie Petty Nelson ("Nelson"), as charged, of second degree murder, La. R.S. 14:30.1. The trial court sentenced Nelson to the mandatory term of life imprisonment without benefit of parole, probation or suspension of sentence. She now appeals the conviction and sentence. We affirm.

FACTS
Although they lived in Richland Parish, Louisiana, Bryan "Dale" Bonnette ("Bonnette") and his wife, Donna ("Donna"), owned a trailer camp in Caldwell Parish on Templeton Bend Road, on Woolen Lake, in an area of the parish colloquially referred to as "Hazard County." Nelson and Donna were best friends and had known each other for over twenty years. In late April 1998, Nelson leased a piece of property adjacent to the Bonnettes' camp. Nelson, along with her boyfriend, Joe Perot ("Perot"), intended to make their camp, a small frame house, their home.
The Bonnettes, Nelson and Perot maintained a campfire on the property between the Bonnettes' trailer and Nelson's home. On the evening of Saturday, May 2, 1998, the Bonnettes, Nelson and Perot sat by *582 the fire talking and drinking beer. At about 8:00 or 9:00 p.m., Perot and Bonnette told Nelson and Donna that they were going fishing; Perot and Bonnette left in Nelson's pickup truck and were gone all night. Instead of fishing, the two men sat by the lake while each drank a case of beer and, between them, smoked three rocks of crack cocaine.
After the two men left, Nelson and Donna continued to sit by the fire drinking beer. At about 2:00 a.m. on Sunday, May 3, 1998, Nelson tripped and fell in her front yard. After an aborted effort to drive themselves to the hospital, Nelson and Donna called the Caldwell Parish Sheriffs Office ("CPSO") and a deputy was dispatched who took them to the hospital to have Nelson's injuries treated. Nelson was diagnosed with a broken nose and released to go home. The women returned to Nelson's house to sleep. Donna, at the behest of the hospital, stayed with Nelson to monitor Nelson's condition.
Bonnette and Perot returned to the campsite early Sunday morning and slept for a few hours. Sometime before 10:00 a.m., Bonnette gained entrance into Nelson's home and proceeded to pull Donna out of the house by the arm. After Donna went back into the house, Nelson called CPSO and either Nelson or Donna locked the door. Bonnette then sought to forcibly enter Nelson's home through the locked door but left the scene driving the car belonging to him and Donna when he learned that Nelson had called CPSO. CPSO deputies Ed Basco ("Basco") and Orvis Watson arrived at Nelson's home at 10:23 a.m. and found that Nelson's front door appeared as if it had been locked and then forced open. Donna took Basco into the Bonnette trailer where the deputy saw that someone had thrown the contents of the refrigerator onto the floor. When Nelson expressed a desire to press charges against Bonnette, Basco informed her to come to CPSO headquarters on Monday morning to file a complaint. After a brief drive through the area in an unsuccessful search for the Bonnettes' car, the deputies left. Nelson, Perot and Donna then went back to their chairs by the campfire and drank beer. Nelson armed herself with a.38 revolver.
After leaving Nelson's camp, Bonnette met Jimmy O'Neal ("O'Neal"). O'Neal and Bonnette drove, in O'Neal's truck, to Richland Parish where they stayed for about two hours; Bonnette drank two or three beers during that time. The two men then returned to O'Neal's camp, which is near Bonnette's and Nelson's camps, between 11:00 a.m. and 12:00 noon. Bonnette fell asleep on O'Neal's couch.
At approximately 4:00 p.m., O'Neal drove Bonnette to Bonnette's father's nearby camp where Bonnette had left his car. O'Neal then drove back to his home.
Bonnette drove back to the campfire at Nelson's camp and slid to a stop between the campfire area and the Bonnettes' trailer. While in his car, Bonnette allegedly inquired as to who had signed the warrant against him. Nelson admitted that she had done so.
Nelson testified that after she told Bonnette she had sought his arrest, Bonnette got out of the car with perhaps a Busch beer can in his hand. Nelson said that she then fired up into the air as a warning shot.
Perot testified that Nelson said, "If you mess with any of us, DaleI will kill you if you mess with any of us." The evidence is conflicting as to whether or not Bonnette then threw the beer can at Nelson, which, she testified, struck her in the face. She also stated that Bonnette threatened to kill her. Donna denied that this occurred, and Perot initially told police that Bonnette had nothing in his hand when he got out of the car but corroborated Nelson's version of the event at trial.
Nelson claimed that Bonnette then came up to her, brutally struck her on the upper body with a plastic lawn stool and stepped on her foot. Perot corroborated this portion of the events. An overturned plastic *583 lawn stool appears in the photos of the scene. Photos of Nelson taken after the event show bruises to her back and shoulder. Donna denied that Bonnette struck Nelson with the stool.
At this point, Perot tackled Bonnette. Perot claimed that as the two hit the ground, Bonnette landed on top of him. He then grabbed Bonnette by the hair, kneed him in the stomach and rolled Bonnette off of him. Perot stated that from his position on the ground he could not see Bonnette. Nelson claimed that Bonnette separated himself from Perot and reached over to the woodpile to pick up one of the sticks but admitted that Bonnette never picked up any of the sticks. Claiming that she feared Bonnette was going to kill them, Nelson fired at Bonnette from at least two and one-half feet or more away, killing him.[1]
Nelson admitted to sheriffs deputies that she shot Bonnette and would do it again.
Nelson said that she drank several beers after the shooting. A blood-alcohol test conducted on Nelson at 7:17 p.m. revealed a blood-alcohol content (BAC) of .236 grams/percent. A toxicology screen of Bonnette's body revealed a BAC of .181 grams/percent. The screen also revealed Valium and a "significant amount" of methanol in Bonnette's blood as well as cocaine in his urine.
As a result of these events, Nelson was charged with the second degree murder of Bonnette. After conviction and sentencing, Nelson filed motions for post-verdict judgment of acquittal and for a new trial. When the court denied the post-trial motions, this appeal ensued.

DISCUSSION

Sufficiency of the Evidence
In her first assigned error, Nelson argues that the evidence was insufficient to convict her of second degree murder because the state failed to prove Nelson had the specific intent to kill or inflict great bodily harm. Specifically, Nelson argues that the evidence failed to prove beyond a reasonable doubt that she did not act in self-defense. Alternatively, Nelson argues that the evidence was sufficient to prove only the crime of manslaughter.
The accused may be entitled to an acquittal if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution in accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731, 734 (La.1992). When the entirety of the evidence, including erroneously admitted evidence, is insufficient to support the conviction, the accused must be acquitted and the remaining issues concerning trial error become moot. Id.
Under Jackson v. Virginia, supra, the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, 29,253 (La.App.2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
*584 The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.09/25/98), 719 So.2d 610, writ denied, 98-2723 (La.02/05/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir. 1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. Bosley, supra. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App.2d Cir.05/08/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.06/26/98), 719 So.2d 1048.
A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20. When a defendant in a homicide case claims self-defense, the state has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. State v. Garcia, 483 So.2d 953 (La.1986). Factors to consider in determining whether a defendant had a reasonable belief the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing and the defendant's knowledge of the assailant's bad character. State v. Hudson, 33,357 (La.App.2d Cir.05/10/00), 760 So.2d 591; State v. Hardeman, 467 So.2d 1163 (La.App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. State v. Brown, 414 So.2d 726 (La.1982); Hudson, supra.
In order for the defendant's actions to be justified, the force used must be reasonable under the circumstances and apparently necessary to prevent an imminent assault. State v. Salter, 31,633 (La. App.2d Cir.02/24/99), 733 So.2d 58, writ denied, 99-0990 (La.09/24/99), 747 So.2d 1114.
The justification offered by Nelson for the shooting was that the victim was attempting to arm himself with a board and she feared he would kill her. Specifically, Nelson's testimony of Bonnette's actions regarding actually having the piece of wood in his hand was that "He had it on it. He never picked it up." Donna testified that her husband was getting up off the ground and dusting himself off or in a crouched position when he was shot. Coroner Steven Hayne testified that the trajectory of the bullet which caused Bonnette's back entry wound was indeed consistent with Bonnette reaching, bending over, rising up or pushing himself off of the ground.
At trial, Perot repeated the words of Nelson that she had to kill Bonnette because he was going to beat them with a two-by-four. Nevertheless, in his statement to police shortly after the crime, *585 Perot failed to mention an impending beating. Indeed, Perot stated the following:
Q: Why would she let him come that close to her and hit her with the stool and not shoot then? Why did she wait `til he gets back over there?
A: Cause she didn't want to shoot the man really to begin with.
Q: But I mean, the danger point was gone when she did shoot.
A: Yeah cause I already had him down on the ground. That's true.
Q: And he was turned away from her when, when she shot him.
A: Yes, sir. I agree with that. I said, I said "Why'd you shoot him? I had him ... I had him on the ground? I said "Why'd you shoot him?" She said "That worthless son-of-a-bitch needed to die."
Although Perot testified at trial that as the two fought, he and Bonnette fell onto the woodpile, and Bonnette's hat was found in this area, Deputy Jeff Bailes ("Bailes"), the first deputy to arrive on the scene, testified that Bonnette's body was some nine or ten feet away from the woodpile. According to Bailes' testimony, photos S-5 and S-6, which depict Bonnette's body, respectively, in relation to the woodpile and in isolation, show the body approximately three feet closer to the woodpile than it was originally because the paramedics had moved the body. He found no weapons around the body.
The jury obviously rejected Nelson's testimony that she feared for her life under these circumstances. Certainly, Nelson admitted that Bonnette was unarmed. Moreover, the medical evidence showed that Bonnette was shot in the back and was not in an aggressive posture at the time of the shooting. Finally, Perot's initial statement to the police and the photographs of the crime scene substantiate the conclusion that Bonnette was either restrained from or at a distance which prohibited his securing a piece of wood that might have given Nelson the reasonable belief that she was in danger of losing her life or receiving great bodily harm. Even when balanced against the confusion and excitement attendant to the situation, this evidence supports the conclusion that any danger of imminent assault had been removed. Accordingly, we find that the jury could have reasonably concluded Nelson's actions were not justified.
Nor can we find that the evidence was insufficient to support the second degree murder conviction.
In pertinent part, second degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1).
Manslaughter is defined as a homicide committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31. "Sudden passion" and "heat of blood" are mitigating factors in the nature of a defense. State v. Lombard, 486 So.2d 106 (La.1986). A defendant is required to prove by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" for a verdict of manslaughter to be appropriate. Lombard, supra. In reviewing a defendant's claim that he has met that burden, the appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigatory factors had not been established by a preponderance of the evidence. Lombard, supra; State v. Lewis, 28,973 (La.App.2d Cir.12/11/96), 685 So.2d 1130, writ denied, 97-0122 (La.05/16/97), 693 So.2d 797.
Nelson contends that at the time of the shooting she was acting in "sudden passion" *586 or "heat of blood" that would have deprived an average person of self-control or cool reflection, obviously based upon her allegations that Bonnette threw a beer can in her face and hit her with a stool.
With the conflicting evidence before it relating to the claimed altercation between Nelson and Bonnette, the jury could have certainly rejected Nelson's tale of provocation immediately prior to the shooting. Moreover, even accepting that the events transpired as Nelson testified, the record shows that Nelson armed herself with a gun after Bonnette attempted to forcefully enter her home on the morning of the incident and remained armed with the weapon all day until Bonnette returned to the campsite. Because Bonnette left the scene without taking Donna with him, it was not unreasonable to conclude that Nelson armed herself knowing that Bonnette was certain to return. Nelson not only failed to retreat from the scene, despite her testimony that she believed Bonnette was going to run over her with his car, but she participated in a verbal altercation with the victim despite her knowledge of his violent tendencies. This evidence certainly suggests that Nelson sought a confrontation with Bonnette. Combining these facts with Perot's statement that his intervention into the scuffle between Nelson and Bonnette had removed any imminent danger to Nelson and the photographs depicting the distance of the body from the woodpile, the jury could have reasonably found that Nelson's shooting of a restrained and/or unarmed man who was turned away from her demonstrated proof of Nelson's active desire to shoot Bonnette. Nelson's repeated statements and admissions soon after the shooting that she intended to shoot Bonnette also revealed her intent and belied the fact that she was acting in self-defense or "heat of blood." Such a finding is within the great discretion afforded the jury. Our review of the sufficiency of the evidence does not extend to credibility determination made by the fact-finder. State v. Williams, 33,881 (La.App.2d Cir.09/27/00), 768 So.2d 728. Accordingly, when viewed in the light most favorable to the state, this evidence is sufficient to prove beyond a reasonable doubt that Nelson killed Bonnette while possessing the specific intent to kill or inflict great bodily harm.

Blood-Alcohol Test Results
Nelson complains that the trial court erred by admitting the results of her blood-alcohol test. In a pre-trial motion to suppress, Nelson sought to exclude the results as violative of her Fourth Amendment rights because the results of this test were tainted and did not accurately reflect her blood alcohol content at the time of the alleged offense. After a hearing, the trial court denied Nelson's motion finding that there was no evidence that the evidence was improperly seized and that the proper weight to be afforded the evidence would be determined by the jury.
On appeal, Nelson argues that the introduction of her blood alcohol level significantly prejudiced her case because it left the jury with "an untrue impression" that she was likely significantly more intoxicated at the time of the shooting than she actually was. Because, however, Nelson failed to raise this specific ground in her written motion to suppress or at the time the evidence was introduced, she is precluded from raising this issue on appeal. State v. Clayton, 427 So.2d 827 (La. 1982); State v. Johnson, 32,910 (La.App.2d Cir.01/26/00), 750 So.2d 398.
Moreover, the record shows that the jury was well aware of Nelson's contention that she had consumed alcohol after the crime. Additionally, Dr. David Roane, a pharmacologist called on behalf of the defense, testified that Nelson probably had been drinking beer after the shooting because a BAC of .236 at 7:17 p.m. would be consistent with a BAC of .3 at 4:00 p.m. if Nelson had nothing alcoholic to drink in the meantime. Dr. Roane explained that Nelson would not have been able to engage in the activities described *587 as occurring that afternoon, if in fact her BAC was a .3, because a .3 BAC is "approaching surgical anesthesia." Therefore, the jury was well aware of all circumstances regarding the consumption of alcohol by Nelson. Under these circumstances, Nelson has failed to demonstrate prejudice in the introduction of the evidence at trial.

Excessive Sentence
In her final assignment of error, Nelson complains that the trial court failed to adequately comply with La.C.Cr.P. art. 894.1 and imposed a constitutionally excessive sentence.
Because Nelson filed no motion to reconsider sentence, this court has held that our review is limited to the bare claim that the sentence is constitutionally excessive. State v. Mims, 619 So.2d 1059 (La.1993); State v. Duncan, 30,453 (La. App.2d Cir.02/25/98), 707 So.2d 164. The sentence of life without benefits is mandatory for this crime and needs no justification. State v. Koon, 31,177 (La.App.2d Cir.02/24/99), 730 So.2d 503. Of course, the jury was made aware of this mandatory sentence in the trial court's charge.
Specifically, Nelson urges that her age, bad health, first felony status and use of alcohol at the time of the killing are factors which make the sentence imposed constitutionally excessive under these circumstances.
In State v. Johnson, 97-1906 (La.03/04/98), 709 So.2d 672, in the context of habitual offender sentencing, the supreme court stated:
[T]o rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that:
[he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
It is the legislature's prerogative to determine the length of a sentence imposed for the crimes classified as felonies, and the courts are charged with applying those punishments unless they are found to be unconstitutional. State v. Armstrong, 32,279 (La.App.2d Cir.09/22/99), 743 So.2d 284, writ denied, 99-3151 (La.04/07/00), 759 So.2d 92. Moreover, this court has afforded great deference to the legislature's determination of an appropriate minimum sentence. State v. Ruffins, 32,870 (La.App.2d Cir.12/10/99), 748 So.2d 614.
The argument set forth by Nelson that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Parker, 416 So.2d 545 (La.1982); State v. Brooks, 350 So.2d 1174 (La.1977); Ruffins, supra; Armstrong, supra; State v. Hereford, 518 So.2d 515 (La. App. 3d Cir.1987).
From the record before us, we cannot find that Nelson has sufficiently demonstrated she is the "exceptional" defendant for which downward departure from the statutory minimum sentence is required. Nelson's use of a handgun resulted in a purposeless and unprovoked killing for which she showed no immediate remorse. Under the totality of the circumstances, Nelson's age, health and lack of a prior criminal record are insufficiently mitigating to overcome the presumption of constitutionality in this case. We find no merit to this argument.

Error Patent
We note that the trial court failed to adequately advise Nelson that the prescriptive period for filing post-conviction relief does not begin to run until the judgment is final. Although this apparent oversight is not grounds for reversal under La.C.Cr.P. art. 921, the required notice is designed to apprise the defendant *588 in advance about the statutory limitation. Accordingly, the district court is hereby directed to send appropriate notice in accordance with the newly amended provisions of La.C.Cr.P. art. 930.8 (Acts 1999, Regular Sess., No. 1262) within thirty days of the rendition of this opinion, and then file, in the record, proof that Nelson received such notice. State v. Morvan, 31,511 (La.App.2d Cir.12/19/98), 725 So.2d 515, writ denied, 99-0186 (La.05/28/99), 743 So.2d 659.

CONCLUSION
For the above reasons, we affirm Nelson's conviction and sentence.
AFFIRMED.
NOTES
[1] Coroner Steven Hayne, who conducted the postmortem examination of Bonnette, testified that the bullet which killed the victim traveled downward (at a thirty-to forty-degree vertical angle and a twenty-to thirty-degree horizontal angle) as it entered Bonnette's left upper back and was fired from at least two and one-half feet away based upon the absence of residue (smudging, smoke from the gun, unburned fragments of powder, tattooing or burning on the shirt) on Bonnette's body. The cause of Bonnette's death was a gunshot wound to the left lung and aorta and extensive bleeding into the body cavity.