774 So.2d 1178 (2000)
STATE of Louisiana, Appellee,
v.
Troy HOPKINS, Appellant.
No. 34,119-KA.
Court of Appeal of Louisiana, Second Circuit.
December 20, 2000.
*1179 Louisiana Appellate Project, By Peggy J. Sullivan, Monroe, Stephen A. Glassell, Shreveport, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Traci A. Moore, Tommy J. Johnson, Assistant District Attorneys, Counsel for Appellee.
Before WILLIAMS, CARAWAY & PEATROSS, JJ.
*1180 PEATROSS, J.
Defendant, Troy Hopkins, was convicted of manslaughter, a violation of La. R.S. 14:31, adjudicated a third-felony offender and sentenced to life imprisonment as required under La. R.S. 15:529.1. Defendant appeals from his conviction and sentence. For the reasons stated herein, we affirm.

FACTS AND PROCEDURAL HISTORY
On August 31, 1997, at approximately 3:00 p.m., Defendant shot and killed the victim, Roderick Adger, while on the way to make a drug exchange. Mr. Adger's friend, Amy White, was present during the shooting.
Mr. Adger, who lived with his girlfriend in a house on Lyon Street, contacted Ms. White, who lived in Mr. Adger's home on Malcolm Street, about a half block away. Mr. Adger, disturbing Ms. White's sleep, informed her that Defendant would be arriving at the house on Malcolm Street, at which time Ms. White was to go to Mr. Adger's residence on Lyon Street and inform him of Defendant's arrival. Ms. White informed Mr. Adger of Defendant's arrival at the Lyon Street address, at which time Mr. Adger armed himself with his .38 caliber pistol hidden under his shirt and sagged pants.
Himon Jones, Jr., Mr. Adger's first cousin, had just arrived at Mr. Adger's Lyon Street address to deliver a vehicle belonging to Mr. Adger's girlfriend, Philea, on which he had been making repairs. Mr. Adger, accompanied by Ms. White and Mr. Jones, drove the vehicle to the Malcolm Street address to meet Defendant. While at her home, Ms. White secured her nine-millimeter pistol in a brown paper bag to carry with her on the drug transaction.
Mr. Adger, Ms. White, Mr. Jones and Defendant then left the Malcolm Street address together in the vehicle. Seated in the four-door vehicle were Mr. Adger in the driver's seat, Defendant in the front passenger seat, and Mr. Jones and Ms. White in the backseat.[1]
Mr. Jones testified that, after having traveled only a short distance, he noticed that Defendant was pointing a pistol at him. Mr. Jones then jumped from the moving vehicle. Startled by Mr. Jones' immediate departure from the vehicle, Ms. White looked up to discover that Defendant was pointing a pistol at the side of Mr. Adger's head. Defendant demanded whatever drugs and money Mr. Adger possessed, which Mr. Adger turned over. As the remaining trio drove down Wallace Street toward Midway Street, only a few blocks from the initial point of departure, Defendant climbed between the bucket seats of the car to the back seat, keeping his pistol pointed at Mr. Adger. Ms. White requested that she and Mr. Adger be released since Defendant had what he wanted. Once the vehicle was stopped at the intersection of Wallace Street and Midway Street, Defendant agreed to release Ms. White; however, Ms. White did not want to leave the vehicle without Mr. Adger. Ms. White exited the vehicle and waited near the trunk of the vehicle on the passenger side, disregarding Defendant's request that she walk away. Defendant told Ms. White to open the door on the front passenger side for Mr. Adger and to then move back. Mr. Adger, who was wearing a seat belt, was told to slide out of the unfastened seat belt. Mr. Adger managed to slide across to the passenger side and exit the vehicle. Suddenly, before Mr. Adger could completely turn toward the vehicle or utter Ms. White's name, Ms. White stated that she witnessed Defendant fire his gun at Mr. Adger, wounding him in the right side of his chest. Mr. Adger then returned fire in the direction of Defendant.
*1181 Ms. White testified that she did not see Mr. Adger with his gun out at the time Defendant first fired. She further stated that Mr. Adger, after being wounded, said, "Amy, serve him." This meant that Mr. Adger wanted Ms. White to retaliate. Ms. White fired all of her ammunition in the direction of Defendant and then fled the scene, running approximately four blocks to her house on Malcolm Street.[2] After returning fire, Defendant drove off in the vehicle with the stolen drugs. The vehicle was later found totally destroyed by fire.
Ms. White returned to the scene several minutes later and found Mr. Adger a few houses away from the scene of the shooting on Michel Street, fatally wounded; Mr. Adger later died at the hospital from the gunshot wound to the right side of his chest. The bullet entered the right side of Mr. Adger's chest and traveled in a descending lateral direction damaging his right lung, diaphragm, stomach and liver.
Soon after the shoot-out, officers arrived to process the crime scene. Ms. White was questioned briefly, but left the crime scene to check on Mr. Adger at the hospital. The following day, Ms. White was shown a photographic lineup and immediately identified Defendant as the person who shot Mr. Adger. Mr. Jones was shown the same photographic lineup on September 3, 1997, and also immediately identified Defendant as the person who shot Mr. Adger. Defendant was arrested later that night and was eventually indicted by a grand jury for first degree murder. The indictment was later amended, however; and Defendant was indicted for second degree murder.
Defendant filed a motion to suppress Ms. White's and Mr. Jones' identifications of him in the photographic lineup, alleging that it was suggestive because there was a distinguishable nature and quality to his photograph in the lineup which allegedly made it stand out from the others. The officer who compiled the lineup testified that the slight reflection which had occurred on each of the other photographs did not occur on Defendant's photograph because his was processed with a newer system. The trial court denied Defendant's motion, concluding that the identification process was not blemished by that fact.
At trial, the State called Ms. White, the single eyewitness to the shooting of Mr. Adger. She, as well as Mr. Jones, testified that Defendant was with them the day that Mr. Adger was shot. Detectives Mike Day and Paul Robinson testified concerning the procedure of the photographic lineup in which Mr. Jones and Ms. White participated and positively identified Defendant as the perpetrator. In addition, Richard Beighley, an expert in firearms identification, identified the bullet recovered from Mr. Adger's body as a bullet from a .380 caliber weapon. Lieutenant Mark Rogers testified as an expert in fingerprint identification and crime scene reconstruction. His testimony revealed that both a .380 caliber and a nine-millimeter weapon had been fired at the crime scene. .380 caliber casings were found in a cluster on Wallace Street near it's intersection with Midway Street. He testified that the cluster pattern of the spent casings might indicate that a person had fired the weapon from the far or driver's side of a vehicle while remaining relatively stationary. The nine-millimeter casings were found to be spread in a linear pattern which might indicate a person was walking or running while the weapon was being fired. His testimony further revealed that, due to the placement of the entry wound, Mr. Adger's arm may have been raised to return fire in the direction of the person shooting at him. *1182 Lieutenant Rogers also explained that the lack of bullet holes in the recovered vehicle could have been due to the fact that any shots fired by Mr. Adger and Ms. White were made while they were retreating from the scene, seriously diminishing accuracy even at that close range. His testimony about the bullet casings and the crime scene was not determinative, however, of who shot first or if Defendant acted in self-defense as he alleged at trial.
The only evidence related to the issue of self-defense was the testimony of an unfound witness, Vanessa Hall. Ms. Hall gave a statement to Detective Robinson at approximately 5:00 p.m., August 31, 1997, shortly after the shooting. She lived about one-half block away from the crime scene and witnessed the shooting through her open front door from the front room of her house. Defense counsel was unable to locate Ms. Hall for trial. After much discussion between counsel and the bench, the trial court admitted this hearsay evidence.
The Louisiana Supreme Court's holding in State v. Gremillion, 542 So.2d 1074 (La. 1989), allowed for the presentation of hearsay evidence if the evidence was reliable and trustworthy and the exclusion of the hearsay evidence would interfere with the defendant's constitutional rights to present a defense. Detective Robinson testified that his report of his interview with Vanessa Hall reflected his notes and memory at the time of the interview. The report revealed that Ms. Hall saw the two individuals standing outside of the vehicle fire first. In testimony before the jury, however, Detective Robinson stated that he had not written in his report who fired first. He testified that it would have been difficult, if not impossible, for Ms. Hall to have been able to definitely identify who fired first from her location in reference to the crime scene.
Defendant was convicted by the jury of manslaughter, in violation of La. R.S. 14:31, a responsive verdict. An Habitual Offender Hearing followed, in which Defendant was adjudicated an a habitual offender and subsequently sentenced to life imprisonment without the benefit of parole, probation or suspension of sentence, as required by La. R.S. 15:529.1. Defendant argues that the adjudication of the first offense included for the motion, wherein he entered a guilty plea, was invalid because the trial judge failed to inform him at the time of his plea of the maximum penalty for simple robbery and maximum penalty exposure.

DISCUSSION

Assignment of Error Number One: There was insufficient evidence at trial to support the verdict of manslaughter.
Defendant argues that he was acting in self-defense and that the State failed to meet its burden of proof to show otherwise. Pursuant to Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.), writ denied, 605 So.2d 1089 (La. 1992). Further, this court has held that:
... where the trier of fact has made a rational determination, an appellate court should not disturb it. Indeed, in the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the fact-trier, is sufficient support for the requisite factual conclusion." State v. McHenry, 30,537 (La. App.2d Cir.4/9/98), 711 So.2d 404, writ denied, 99-0281 (La.6/18/99), 745 So.2d 615.
Self-defense is the justification for a killing if the person committing the homicide reasonably believes that he is in *1183 imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20(1). The State bears the burden of proving beyond a reasonable doubt that the killing was not in self-defense. State v. McHenry, supra. In other words, the State must prove that the perpetrator was the aggressor. A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he shows that he made a good faith effort to withdraw from the conflict, and his adversary knew or should have known that he desired to withdraw and discontinue the conflict. La. R.S. 14:21.
The testimony of one witness may be found to be sufficient for a trier of fact to draw the necessary factual conclusions. State v. McHenry, supra. During Ms. White's testimony, she stated that she saw Defendant shoot Mr. Adger first, which would make Defendant the aggressor. Further, Ms. White testified that, not only did Defendant steal the victim's drugs at gunpoint, he also shot the victim before the victim could draw his weapon and thereafter stole his vehicle.
Conversely, hearsay testimony by Detective Robinson of his interview with Ms. Hall was that Mr. Adger and Ms. White fired first. Whether or not it would have caused the jury to speculate whose story was most believable is not required for proper disposition of this assignment of error. The law requires only that a rational determination be based on the evidence presented. On this record, we cannot say that the jury did not make a rational determination.
We do not find the Defendant's argument of self-defense to be well founded given the eyewitness testimony of Ms White and the lack of potency of the third-party eyewitness' statement made by Ms. Hall to Officer Robinson. Both witnesses' testimonies were heard and weighed by the jury.
Moreover, the uncontroverted testimony of Mr. Jones and Ms. White indicates that Defendant was engaged in an armed robbery at the time of the shooting, clearly making him the aggressor. A defendant who has brought on the difficulty by engaging in an armed robbery at the time the victim is shot cannot claim the right of self-defense. La. R.S. 14:21; State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326; cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996). See also State v. Bacon, 578 So.2d 175 (La.App. 1st Cir.1991), writ denied, 93-0694 (La.3/30/95), 651 So.2d 857. We find, therefore, that, regardless of the conflicting testimony regarding who fired the first shot, Defendant was unquestionably the aggressor and has no right to claim self-defense. This assignment is without merit.
Assignment of Error Number Two: The trial court erred in refusing to suppress the identification of Defendant by the witnesses, Amy White and Himon Jones.
In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court set forth a five-part test to determine whether an identification was reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation.
The defendant bears the burden of showing that the identification procedure was suggestive and the possibility of misidentification by the eyewitness. State v. McHenry, supra. Further, under the totality of the circumstances, the identification procedure, though suggestive, would be admissible if found to be reliable. Id., citing State v. Davis, 550 So.2d 774 (La. App. 2d Cir.1989).
At Defendant's hearing on the motion to suppress, the trial court denied his motion to suppress the photographic lineup because *1184 the identification procedure was not found to be suggestive. Defendant complained about the quality of the photographs in the lineup in relation to his photograph because his was the only one in the lineup that did not have a glare and did not come from the Automated Fingerprint Identification System ("AFIS"). The distinction was acknowledged by the trial court; however, the trial court determined that the distinction was not suggestive. We agree. Having viewed the photographs, we find that the glare complained of is not so significant as to draw one's attention to any particular photograph.
Applying the five-part test as outlined by the Supreme Court, the identification was reliable. First, both Ms. White and Mr. Jones were in the vehicle with Defendant during the commission of the robbery. Next, both Ms. White and Mr. Jones were attentive because they were immediately aware that Defendant was in possession of a pistol.
Prior descriptions of Defendant by Ms. White were questioned because Officer Davis testified that Ms. White told him the perpetrator's name was Tyrone Frazier. Ms. White, however, testified that she told Officer Davis the perpetrator's name was Troy Hopkins and that she did not know a Tyrone Frazier. Detective Day testified that Patrick Frazier was a bystander to the shooting and that the only Tyrone Frazier he knew of was a well-known local athlete who was currently playing basketball at Louisiana State University.
Aside from minor discrepancies in the reporting of the descriptions of Defendant by Ms. White, she identified Defendant by name prior to the lineup, although defense counsel did contend that Ms. White gave another name to the interviewing officer at the crime scene. Detective Robinson testified that Ms. White immediately identified Defendant by name and later picked him out in the lineup without assistance or prompting. Additionally Mr. Jones testified that Defendant was the person in the car the day of the crime. Last, at trial, both Ms. White and Mr. Jones identified Defendant as the assailant at the time of the crime. This assignment is, therefore, without merit.
Assignment of Error Number Three: The trial court erred in adjudicating Defendant a third felony offender.
Pursuant to La. R.S. 15:529.1(D), the district attorney of a parish, where a subsequent conviction occurred, may file a bill of information accusing the person of a previous conviction or adjudication of delinquency. Upon such filing, the trial judge shall fix a day to inquire whether the offender has been convicted of a prior felony or felonies. After contradictory hearing, there is a statutory mandate upon the finding of either the third-felony conviction or two previous felony convictions, constituting crimes of violence, that a third-felony offender be imprisoned for the remainder of his natural life, without benefit of parole, probation or suspension of sentence. La. R.S. 15:529.1A(1)(b)(ii).
Defendant contends that the guilty plea which he entered in 1990 regarding the crime of simple robbery was not sufficient to form a basis to adjudicate him a third-felony offender. The trial court transcript regarding the simple robbery does not reflect that Defendant was advised of the maximum penalty exposure. Conversely, the State points out that Defendant did not need to be informed in court of the maximum sentence for the crime because it was an agreed-upon sentence of three years.
Invalidity of the adjudication of a previous conviction because the trial judge failed to notify defendant of maximum possible penalties when a guilty plea was entered is a question of law. The law requires that a guilty plea be free and voluntary on the part of the defendant. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).
The supreme court in State v. Anderson, 98-2977 (La.3/19/99), 732 So.2d 517, found that, although advice with respect to a *1185 defendant's sentencing exposure may facilitate the taking of a voluntary guilty plea, see State ex rel. LaFleur v. Donnelly, 416 So.2d 82 (La.1982); La.C.Cr.P. art. 556.1(A)(1), it has never found that it formed part of the core Boykin requirements for the entry of a presumptively valid guilty plea in any case. State v. Nuccio, 454 So.2d 93, (La.1984); State v. Baum, 95-0384 (La.App.3d Cir.10/4/95), 663 So.2d 285, writ denied, 95-2685 (La.2/9/96), 667 So.2d 528. Furthermore, since the trial courts were not required by statute to advise Defendant of his sentencing exposure at the time of the taking of the 1990 plea, he has failed to present affirmative evidence of any procedural irregularity which would have warranted the shift of the burden of proof to the State. State v. Perkins, 99-1109 (La.App. 5th Cir.4/25/00), 762 So.2d 67. This assignment is, therefore, without merit.
Assignment of Error Number Four: The trial court erred in imposing a sentence that was harsh and excessive under the facts and circumstances of this case.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. The record must show adequate consideration of the criteria set forth in La.C.Cr.P. art 894.1. Second, the reviewing court considers whether the incarceration is too severe considering the circumstances of the case and the background of the defendant. State v. Bradford, 29,519 (La. App.2d Cir.4/2/97), 691 So.2d 864.
Defendant filed a motion to reconsider sentence; he failed, however, to assert as error the failure of the trial court to comply with La.C.Cr.P. art. 894.1. It is essential that a defendant present arguments to the trial court that he wishes to preserve on appeal. When a defendant fails to present his specific arguments, he is relegated to having the appellate court consider the bare claim of constitutional excessiveness. State v. Mims, 619 So.2d 1059 (La.1993); State v. Duncan, 30,453 (La.App.2d Cir.2/25/98), 707 So.2d 164. We find, therefore, that Defendant cannot now complain about the court's alleged failure to comply with La.C.Cr.P. art. 894.1.
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, supra.
The trial court properly considered the fact that Defendant was a third-felony offender under the statute, and this finding mandated life imprisonment without probation, parole or suspension. We find, therefore, that the trial court was not required to give reasons for its application of the habitual offender statute as required by law under La. R.S. 15:529.1. The sentence is not excessive. This assignment is, therefore, without merit.

CONCLUSIONS
For the foregoing reasons, the sentence and conviction of Defendant, Troy Hopkins, are hereby affirmed.
AFFIRMED.
NOTES
[1] There is conflicting testimony as to where in the backseat Mr. Jones and Ms. White were seated.
[2] Ms. White literally ran out of her shoes when she fled the scene. Testimony of investigating officers indicates a pair of women's running shoes was found in the northbound lane of Wallace Street. Ms. White later identified the shoes as belonging to her and stated that she did not have them completely on, which is why they came off when she began to run away.