h NORRIS, Chief Judge.
Anthony Chism was indicted for the second degree murder of Fredrick Owens. He was convicted at a bench trial of manslaughter and sentenced to serve 34 years imprisonment at hard labor, the first 20 years of which to be without benefit of parole, probation, or suspension of sentence. On appeal, Chism argues that the evidence was constitutionally insufficient to support his conviction, and in fact proves that he acted in self-defense. For the following reasons, we affirm.

Facts

On the morning of July 28, 2000, Fredrick Owens, 16, was returning from the Lo Mart grocery to the Kings Manor Apartments by a foot path when he encountered Anthony Chism. Jarvis Morris, 14, testified that he saw Owens, who was unarmed, pushing his bicycle toward the apartments and carrying .some grocery bags. Morris witnessed a male, whom he identified at trial as Anthony Chism, approach Owens and start a fight with him. As Owens continued through the trail, Chism followed him and continued the fight. Chism, who was 19 years old at that time, then pulled out a gun and shot at *564 Owens. Owens dropped his bicycle, ran “out of his shoes,” and went through a gate towards the apartments. Morris saw Chism chase after Owens to the front of the apartments.
Darrell Sweeney testified that, at about 10:30 or 11:00 a.m., he was awakened by two or three popping sounds originating from outside his apartment. He looked out of his second floor apartment window and saw two males directly below his window. ' One male, later identified by | {¡Sweeney as Chism, was standing over the unarmed victim with a gun pointed at him. Sweeney testified that the victim, who was still alive and moving, did not make any threatening or menacing gestures toward Chism. Sweeney watched Chism walk around the victim and fire two more shots at him. Chism then ran back through the apartment complex and Sweeney immediately telephoned 911.
Michael Williams, an apartment maintenance worker, testified that he heard the sound of' gunfire while he was leaving apartment number 204 that morning. The shots sounded very close to him, and emanated from the front of the complex. Williams exited building number two from the back stairs and walked around the back of the building. He saw a person wearing a white t-shirt walking out of the rear of the breezeway of building number one. As Williams entered a breezeway he almost walked into a man, and asked him if everything was all right. The man, who was trotting ■ and sweating, did • not respond. Williams observed that the man had a gun in his hand, which he then “stuck” into his pocket. The man continued trotting toward the back complex gate. After the man passed him, Williams proceeded to the front of the complex where he saw a young male on the ground, wearing -a t-shirt and green shorts.-
When Detective ■ Paul Robinson of the Shreveport Police Department arrived at the scene, Owens was lying in the front of the apartment complex next to the road. Owens was transported to LSU Medical Center, where he was later pronounced dead as a result of multiple gunshot wounds. Police officers located a trail of blood leading from the front of the apartments, j ..¡through another set of apartment buildings, through the fence to the back of the Lo Mart store. A sweet potato and a tennis shoe were found on the ground behind Lo Mart, and a matching tennis shoe was found near the gate. No weapon was found on Owens, who was wearing a t-shirt and green gym shorts, nor was a weapon found at the crime scene.
Owens’s mother, Dianne Owens (“Dianne”), testified at trial that Owens was at home the night before the crime. She testified that Chism had previously harassed and threatened her son on at least three specific occasions. The first was an argument between Owens and Chism outside of her home; Chism’s girlfriend and her mother, who both lived two houses down, were also involved. Upon hearing the noise of the argument, Dianne went outside to break it up and told Owens to go inside. Dianne heard Chism threaten Owens, “this s* * * ain’t over with yet.” Chism’s girlfriend’s mother was yelling at Chism, “when an***** get the best of you and stuff, you take a n* * * * * out.” Chism’s girlfriend was also yelling at Chism, who told Dianne that he would be back. Dianne warned Chism that she would call the police if he returned. Dianne heard Chism yelling, “I’ll be back, this s* * * ain’t over with yet.” (expletives deleted)
Sometime later, Chism returned to her home and continued to harass Owens. Dianne heard a knock at the door, and saw Chism standing outside her door, pointing *565 a gun in her face. Dianne froze; Chism ordered her to send Owens outside. Dianne’s daughter slammed the door and telephoned the police, and Dianne warned Owens to stay in his room. Dianne peeked outside and saw Chism standing in the road yelling for Owens to come Doutside. Chism again yelled that he hadn’t forgotten about “it” and that he would be back. Dianne also heard two “booms” at her door, but was afraid to open the door because Chism had a gun.
On a third occasion, Chism came to her home and harassed and threatened Owens. Dianne heard a “boom” outside and saw Chism holding bricks in his hands. Chism had a gun in the waistband of his pants, and was yelling for Owens to come outside. Chism yelled, “I ain’t forgot it.” Chism also said that he had some other boys with him. Dianne telephoned the police, and watched Chism “high five” and laugh with his friend, while he called for Owens to come outside. Dianne warned Owens not to go outside, and he assured her that he wouldn’t. Dianne was afraid for her son’s life. Fearing that Chism would fire the gun into her home, she took a mattress off of the bed and put it on the floor to make a safer place for her family to sleep.
At trial, Dianne identified the defendant as the same Anthony Chism who harassed and threatened her son, Owens. Dianne also identified her own voice from a taped 911 conversation in which she reported Chism’s harassment and threats. The audio tape was played for the court, and introduced into evidence. She further identified photographs of the damage to her home caused by the bricks thrown by Chism. Dianne related that she fenced in her back yard in an effort to deter any further attacks by Chism.
Tangela, Owens’s sister, corroborated her mother’s testimony, adding that she last saw Owens alive on the morning of the crime when he was picking out his clothes and left home with his bicycle. She also identified 1 Bher voice on the 911 tapes from Chism’s previous threatening episodes.
Chism testified on his own behalf. He asserted that Owens threatened to kill him on more than one occasion, and in fact provoked another confrontation with him on the night before his death. Specifically, Chism stated that he was walking past Owens’s house on the way to his girlfriend’s house at approximately 10:30 p.m. on July 27, 2000, when Owens and Owens’s cousin, Ham, ran up to him. Chism testified that Ham pointed a gun at him while Owens robbed Chism’s pockets of money and cigarettes. Chism testified that Owens and Ham threatened to kill him, and that he was afraid for his life.
Chism testified that, the next day at about 10:00 a.m., he went to the Lo Mart store to buy cigarettes and that he encountered Owens as he was leaving the store. Chism stated that he walked past Owens, who was riding a bicycle. When Chism looked back, Owens was getting off of the bicycle, threatening Chism, and walking towards him. Chism stated that, afraid for his life, he pulled out his gun and shot Owens'. Owens ran away and Chism followed him all the way from the back to the front of the apartment complex. Chism stated that he heard Owens say something about getting his cousin, or a gun. Fearing for his life, Chism shot Owens again as he lay on the ground. Chism testified that he walked away, but turned himself into police at headquarters later that same day. On cross-examination, Chism stated that he never saw Owens with a weapon on the morning he was killed. Chism also admitted that he never called the police to report Owens’s threats, but thought that his girlfriend’s mother had done so. |fi Chism admitted that there was no record of the calls.
*566 Dr. Paul Ware, a psychiatrist who interviewed Chism once at defense counsel’s request, presented his diagnosis and opinion at trial. Dr. Ware took a personal history from Chism, diagnosing him with an adjustment disorder with anxious and depressed moods caused by his present situation. Dr. Ware also determined that Chism showed “avoidant” personality traits, which meant that Chism would avoid confrontations. Dr. Ware expressed the opinion that Chism was suffering from an overwhelming “scare and anxiety” and was in fear of his life at the time he shot Owens. Dr. Ware stated that he believed that Chism had been abused, bullied, humiliated and threatened to the point where he acted in self-defense. Dr. Ware further testified that Chism was in such an emotional state at the time of the shooting that his reasoning was impaired and his “blood” was “heated.”
On cross-examination, Dr. Ware admitted that Chism told him that he did not smoke cigarettes, a point contradicted by his trial testimony. Dr. Ware admitted that the trial testimony regarding Chism’s harassment of Owens and his threatening behavior in general was surprising to him, considering his conclusion that Chism had an avoidant personality. Dr. Ware also admitted that Chism’s harassment was inconsistent with trying to avoid trouble “at that time,” but asserted that Chism’s basic personality make-up was to avoid conflict.
After a bench trial, the trial judge rendered a verdict of guilty of the responsive verdict of manslaughter. The state filed a motion to invoke the firearm sentencing provisions of La.C.Cr.P. art. 893.1 et seq. The parties | stipulated that a firearm was used in this crime, and the firearm caused bodily harm to the victim. On September 18, 2001, the trial court sentenced Chism to serve 34 years at hard labor, the first 20 years of which were without benefits.
Chism now appeals his conviction arguing that the evidence was insufficient to support his manslaughter conviction.
Discussion — Sufficiency of the Evidence
Chism argues that the state failed to prove that the killing of the victim was not justified. He asserts that the only direct evidence of the defendant’s state of mind was the uncontroverted expert testimony of the psychiatrist, Dr. Paul Ware, that the defendant shot the victim in self-defense. Chism also notes that this court must review the evidence as to whether the state proved beyond a reasonable doubt that the death of the victim was not caused in self-defense. Chism argues that the state’s evidence of his state of mind was purely circumstantial, and does not exclude every reasonable hypothesis of innocence. Thus, Chism contends that a rational fact finder cannot find the defendant guilty of manslaughter beyond a reasonable doubt.
Although the record does not reflect that defendant filed a motion for post-verdict judgment of acquittal pursuant to La.C.Cr.P. art. 821, this court will consider sufficiency arguments in the absence of such a motion. State v. Green, 28,994 (La.App. 2 Cir. 2/26/97), 691 So.2d 1273.
This court’s authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and does not extend to Incredibility determinations made by the trier of fact. La. Const, art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2 Cir.1984). A reviewing court accords great deference to a fact finder’s decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, 29,253 (La.App. 2 Cir. 4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State *567 v. Rogers, 494 So.2d 1251 (La.App. 2 Cir.1986), writ denied, 499 So.2d 83 (La.1987).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doub.t that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2 Cir. 9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
Intent is a state of mind and need not be proved as a fact, it may be inferred from the circumstances and the acts of the defendant. State v. Kahey, 436 So.2d 475 (La.1983); State v. Ellis, 28,282 (La.App. 2 Cir. 6/26/96), 677 So.2d 617, writ denied 96-1991 (La.2/21/97), 688 So.2d 521.
This court in State v. Hudson, 33,357 (La.App. 2 Cir. 5/10/00), 760 So.2d 591, set forth the law of manslaughter:
Manslaughter is a “homicide which would be [first or second degree murder], but the offense is committed in sudden passion or |flheat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.” La. R.S. 14:31 A(l).
Self-defense is justification for a killing only if the person committing the homicide reasonably believes he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20(1); State v. Cotton, 25,490 (La.App. 2 Cir. 3/30/94), 634 So.2d 937; State v. Jones, 600 So.2d 875 (La.App. 1 Cir.1992), writ denied, 92-2351 (La.5/12/95), 654 So.2d 346. The state has the affirmative duty of proving beyond a reasonable doubt that the killing was not in self-defense. State v. Arnold, 30,282 (La.App. 2 Cir. 1/21/98), 706 So.2d 578.
For a homicide to be justified, the offender must have had a reasonable belief he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary, under the circumstances, to save himself from that danger. La. R.S. 14:20(1); State v. Dozier, 553 So.2d 911 (La.App. 4 Cir.1989), cert. denied, 558 So.2d 568 [(La.1990)].
Factors to consider in determining whether a defendant had a reasonable belief the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing and the defendant’s knowledge of the assailant’s bad character. State v. Hardeman, 467 So.2d 1163 (La.App. 2 Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. State v. Brown, 414 So.2d 726 (La.1982).
When a defendant in a homicide case claims self-defense, the state has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. State v. Garcia, 483 So.2d 953 (La.1986); State v. Flowers, 574 So.2d 448 (La.App. 2 Cir.1991), writ denied, 580 So.2d 666 (La.1991).
In other words, the state must prove that the perpetrator was the aggressor. A person who is the aggressor or who brings *568 on a difficulty cannot claim the right of self-defense unless he shows that he made a good faith effort to withdraw from the conflict, and his adversary knew or should have known that he desired to withdraw and discontinue the conflict. La. R.S. 14:21; State v. Hopkins, 34,119 (La.App. 2 Cir. 12/20/00), 774 So.2d 1178.
On review, the standard is whether a rational factfinder, after viewing the |inevidence in the light most favorable to the state, could have found beyond a reasonable doubt that the homicide was not committed in self-defense. Jackson v. Virginia, supra; State v. Matthews, 464 So.2d 298 (La.1985); State v. Hudson, supra; State v. Ruff, 504 So.2d 72 (La.App. 2 Cir.1987), writ denied, 508 So.2d 64,65 (La.1987).
Direct evidence, in the form of testimony given by eyewitness Morris, proved that the defendant instigated the fight with Owens on the morning of the crime, that Owens did not start the fight, and that Owens did not act aggressively. Morris’s testimony proved that Chism produced a gun and shot Owens, who was unarmed, and literally ran out of his shoes in an unsuccessful attempt to escape from Chism. Morris’s testimony also showed that the defendant chased after Owens through the complex with the gun.
Testimony given by Sweeney, who also saw the defendant shoot the unarmed victim at the front of the complex, corroborated Morris’s testimony, and both eyewitnesses identified Chism in court as Owens’s assailant. The autopsy report proved that Owens had been shot seven times, and the crime scene investigation showed that Owens was unarmed. This crime scenario, related by Morris and Sweeney at trial, was further corroborated by the testimony of Williams, the maintenance worker. The testimony of Owens’s mother and sister, supported by the tape of the 911 telephone conversations, proved that the defendant harassed and threatened Owens on at least three occasions prior to the day of the crime.
The physical evidence produced at trial also supported the testimony given by the eyewitnesses. Owens’s shoes and the sweet potato recovered from In near the Lo Mart on the foot trail, and the documentation of the trail of Owens’s blood which ran through the apartment complex was consistent with the testimony given by Morris, Sweeney, and Williams.
Chism’s testimony painted a much different account of his relationship with Owens, and his version of the shooting itself which was contrary to all the other witnesses’ testimony. Chism claimed that the shooting was in self-defense and was supported by the expert testimony given by Dr. Ware. However, the trial court obviously dismissed Chism’s testimony as self-serving, a credibility call which we see no compelling reason to disturb. State v. Bosley, supra; State v. Rogers, supra. Furthermore, Dr. Ware’s opinion that the crime was committed in self-defense was based upon only one interview with the defendant, and based solely upon facts related to him by the defendant. The fact-finder was entitled to discount this evidence and conclude that the defendant was the aggressor and not entitled to the right of self-defense. La. R.S. 14:21; State v. Hopkins, supra.
A review of the record shows that the evidence was sufficient to support Chism’s conviction of manslaughter. Although Chism claims that the homicide was committed in self-defense, the facts established by direct evidence and inferred by the circumstances, viewed in the light most favorable to the prosecution, support the finding that a rational factfinder could have found beyond a reasonable doubt that *569 the homicide was not committed in self-defense. Jackson v. Virginia, supra; State v. Matthews, supra; State v. Hudson, supra; State v. Ruff, supra.
Specifically, the record clearly supports the finding that Chism was the | ^aggressor, who therefore cannot claim the right of self-defense in the instant case. La. R.S. 14:21; State v. Hopkins, supra. The record further supports the finding that Chism did not have a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary, under the circumstances, to save himself from that danger. La. R.S. 14:20(1); State v. Dozier, supra.
This assignment of error is therefore without merit.

Error Patent

Chism’s second assignment of error was a request for this court to review the record for errors patent. This request is unnecessary since such a review is automatically made in all criminal eases. La. C.Cr.P. art. 920(2); State v. Bryant, 29,344 (La.App. 2 Cir. 5/7/97), 694 So.2d 556. The record has been reviewed for errors patent and none were found.

Conclusion

For the foregoing reasons, Chism’s conviction and sentence are affirmed.
AFFIRMED.