STATE OF LOUISIANA,
v.
KYLE SPRING.
No. 2009 KA 1687.
Court of Appeal of Louisiana, First Circuit.
February 22, 2010.
Not Designated for Publication
HILLAR C. MOORE, III, District Attorney, Counsel for Appellee State of Louisiana.
JEFF TRAYLOR, STACY L. WRIGHT, Assistant District Attorneys, J. DAVID BOURLAND, Counsel for Defendant-Appellant Kyle Spring.
Before: PARRO, KUHN, and McDONALD, JJ.
KUHN, J.
The defendant, Kyle Spring, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. He pled not guilty and waived trial by a jury. At the conclusion of a bench trial, the defendant was convicted as charged. The defendant moved for "Post Verdict Judgment to a Lesser Included Responsive Offense or Acquittal" and for a new trial. The trial court denied the motions. The defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant now appeals, urging two assignments of error, as follows:
1. In that the evidence at trial was not sufficient to support a verdict of second degree murder, and, in the alternative, the court erred in not finding the mitigatory factors of La. R.S. 14:31(A)(1), manslaughter, sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection, existed by a preponderance of the evidence; and the court erred in denial of the motion for Post Verdict Judgment to a Lesser Included Responsive Offense or Acquittal.
2. The trial court abused its discretion, and/or erred in law, by denying the Motion for a New Trial based on newly discovered evidence, and not permitting testimony in support thereof.
Finding no merit in the assigned errors, we affirm the defendant's conviction and sentence.

FACTUAL BACKGROUND
On November 17, 2006, at 11:09 p.m., Robert "Bill" Franchuk, the victim, called the East Baton Rouge Parish Sheriffs Department and requested assistance at Slippery Pete's bar/lounge on Florida Boulevard in Baton Rouge. The victim, a bouncer at Slippery Pete's, explained that there was a patron (subsequently identified as the defendant) at the bar behaving belligerently and "starting trouble." He refused to leave the bar, despite having been repeatedly asked to do so. The victim further explained that each time he was asked to leave the premises, the defendant walked away like he was going to leave, but then he turned around and came right back. The victim was told that a Sheriffs deputy would be sent to Slippery Pete's.
At 11:15 p.m., the victim called the Sheriffs Department and advised that the defendant finally left the establishment. The request for law enforcement assistance was cancelled.
At 11:37 p.m., the victim called the Sheriffs Department again and advised that the defendant had returned to the bar. He again explained that the defendant had been expelled from the bar that night for starting a fight, but he refused to stay away. Again, the victim was advised that a deputy would be sent over.
At 11:47 p.m., the victim called the Sheriffs Department back and cancelled the second request for assistance. He explained that the defendant had walked across the street to another bar and was no longer on the premises.
At 11:56 p.m., the victim placed his final call to the Sheriffs Department In this call, the victim advised that the defendant was back at Slippery Pete's. The victim asked that a deputy be sent over because the defendant was again behaving belligerently and refusing to leave the premises.
Moments later, the victim was fatally injured by a gunshot fired by the defendant from a high velocity SKS rifle. The bullet entered the victim's abdomen and exited the right side of his back. After firing the single gunshot, the defendant fled. The shooting was immediately reported to the authorities.
Shortly thereafter, Detective Todd Morris arrived at Slippery Pete's to investigate. In connection with the investigation, Det. Morris received the defendant's license plate number from an eyewitness to the incident. With the assistance of the defendant's relatives, Det. Morris made contact with the defendant on the phone. During the conversation, Det. Morris requested that the defendant disclose his location and surrender. According to Det. Morris, the defendant replied, "Are you crazy? I am not doing that." The defendant then asked Det. Morris if the victim had died. When Det. Morris indicated he had not, the defendant said, "well, I shot him with a full metal jacket, it should have went straight through him." The defendant disconnected the call without disclosing his location.
At approximately 4:30 a.m. the next morning, the defendant was arrested in Walker, Louisiana. Two hours later, upon securing a warrant for his arrest, Det. Morris transported the defendant to the East Baton Rouge Parish Sheriffs Office for questioning. The defendant waived his right to remain silent and agreed to provide a video recorded statement regarding the incident
In the statement to Det. Morris, the defendant admitted that he patronized Slippery Pete's the night before. However, he indicated that his recollection of the events leading up to, and immediately following, the shooting was limited. The defendant explained that he suffers from post-traumatic stress disorder and sometimes he gets so angry he "blacks out." He told Det. Morris that he only recalled being pushed down in the parking lot at Slippery Pete's and hitting his head. In response, he became so angry he "blacked out." He claimed the next thing he remembered was driving on the interstate towards Hammond and receiving a call on his cellular phone wherein the caller advised that he had shot someone. In this statement, the defendant did not admit or deny shooting the victim.
By the time the defendant testified at his trial, his recollection of the circumstances surrounding the shooting had improved. In his trial testimony, the defendant admitted that he did, in fact, fire the shot that killed the victim, but he claimed the shooting was done in self-defense. The defendant stated he fired the single shot at the victim in response to the victim's pointing a pistol at him during a physical altercation that the defendant was engaged in with the victim's brother, Tom Franchuk. The defendant further testified that Tom Franchuk was the individual who pushed him down in the parking lot on the night of the shooting.
Witnesses for the state testified, however, that the defendant fired the single gunshot at the unarmed victim as he moved backwards with his hands in the air.

SUFFICIENCY OF THE EVIDENCE
In his first assignment of error, the defendant submits that the evidence presented at trial is insufficient to support the second degree murder conviction. Specifically, he asserts that the homicide in this case was committed in self-defense. Alternatively, the defendant argues that the evidence of the circumstances surrounding the shooting warranted only a conviction of the responsive offense of manslaughter. Thus, he argues the trial court erred in denying his "Motion for Post Verdict Judgment to a Lesser Included Responsive Offense or Acquittal."
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. Code Crim. P. art. 821(B); State v. Mussail, 523 So.2d 1305, 1308-09 (La. 1988). When analyzing circumstantial evidence, La. R.S. 15:438 provides, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This statutory test is not a purely separate one from the Jackson constitutional sufficiency standard. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Shanks, 97-1885, pp. 3-4 (La. App. 1st Cir. 6/29/98), 715 So.2d 157, 159.
La. R.S. 14:30.1 defines second degree murder, as follows:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm[.]
Thus, to support the conviction for second degree murder the state was required to show: 1) the killing of a human being; and 2) that the defendant had the specific intent to kill or inflict great bodily harm. State v. Morris, 99-3075, p. 13 (La. App. 1st Cir. 11/3/00), 770 So.2d 908, 918, writ denied, XXXX-XXXX (La. 10/12/01), 799 So.2d 496, cert. denied, 535 U.S. 934, 122 S.Ct. 1311, 152 L.Ed.2d 220 (2002). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be proved by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. State v. Cummings, 99-3000, p. 3 (La. App. 1st Cir. 11/3/00), 771 So.2d 874, 876.
At trial of this matter, the following evidence was introduced regarding the events that transpired at Slippery Pete's on the night of the shooting.
Cindy Cardia, the victim's sister, testified that, at the time of the shooting in this case, she owned Slippery Pete's bar. The victim worked at the bar as a bouncer.[1] According to Cardia, on the night of the shooting the defendant was a customer in the bar. Cardia did not recall ever seeing the defendant in the bar before that night. Cardia testified she received a customer complaint regarding the defendant's behavior in the bar, so she started watching him. At this time, the victim was not at work yet, so Cardia was acting as the bouncer. Once she observed the defendant uninvitingly getting "touchy" with some of the female customers, Cardia approached and asked him to leave. In response, Andy Tridico, a regular at the bar, asked Cardia if the defendant could stay. Andy explained that the defendant was too intoxicated to drive and advised that he would drive the defendant home later that night. Cardia agreed to allow the defendant to stay after Andy insisted that he would monitor the defendant's behavior.
Cardia testified that the defendant subsequently was observed grabbing a female customer by the arm. She claimed she approached the defendant again and this time insisted that he leave the premises. She told Andy that the defendant would no longer be allowed to stay at the bar. The victim, who had recently arrived at the bar, escorted the defendant out of the bar. Cardia testified there was no verbal or physical confrontation between the defendant and the victim at this time. The victim simply placed his arm around the defendant and walked him out the door.
Later, Cardia was advised that the defendant had returned to the bar and was sitting near the back door. Cardia looked over and saw the victim escorting the defendant out the door again. A little while later, Cardia walked out the back door of the bar and observed the defendant, the victim, and her other brother, Tom Franchuk, outside. According to Cardia, Tom was yelling at the defendant. Despite having been asked to leave, the defendant was walking back towards the building. Tom was telling the defendant to leave the premises. Since her brothers appeared to have the situation under control, Cardia went back inside.
After a while, Cardia realized the victim had not come back into the bar, so she went outside to see what was going on. When she walked outside this time, she saw the victim on the phone with the police. The victim told Cardia and others who accompanied her to go back in the building. Cardia complied. Later, Cardia walked outside again to check on the victim. This time she exited the front door of the bar and walked around the building towards the back. According to Cardia, she saw the defendant standing in front of his truck with a rifle. The victim was at the back of the building with his arms held up. Cardia ran back inside the bar, advised Andy that the defendant had a gun on the victim, and picked up the phone to call 911. By the time Cardia returned outside, the victim had been shot. Cardia testified that the victim did not have a gun. Cardia explained, when she saw the defendant with the rifle, the victim's hands were in the air. Cardia further testified that the victim never carried a gun at work. According to Cardia, there was no physical confrontation between the defendant and the victim on the night in question. In fact, Cardia denied witnessing any physical confrontation between the defendant and anyone that night.
Jeremy Roden, a patron, testified that he arrived at Slippery Pete's between 7:00 and 7:30 on the night of the shooting. Later, at around 8:30 p.m., he was asked to walk Sheila Davis, another patron at the bar, to her car. Roden claimed he was walking towards the rear of the building when he saw the defendant, the victim, and Tom Franchuk, engaged in a verbal exchange near the back door. The victim and Tom were trying to get the defendant to leave. Roden claimed he then saw the defendant walk towards his truck, which was parked along the side of the building. The victim and Tom followed the defendant. Tom and the defendant continued to argue as they walked toward the truck. The defendant got into the truck and started leaving. The victim continued to walk alongside the truck and Tom returned to the bar. The defendant did not leave. Instead, he briefly backed up, parked near the back door of the bar, and exited the truck with a gun in hand. The defendant raised the gun, aimed it at the victim and yelled, "Now what, Now what?" The victim raised his hands and started moving backwards. The defendant then moved forward and pulled the trigger.
Sheila Davis testified and corroborated Roden's claim that he walked her to her car (parked at the back of the bar) on the night of the shooting. According to Davis, when she and Roden exited the bar through the front door, she observed some people on the left side of the building "fighting." During the altercation, the defendant was pushed down onto the ground. The defendant got up and the crowd that had gathered to watch the altercation suddenly dispersed. At some point, the defendant moved toward the rear of the bar. A verbal exchange continued between the defendant and the victim. Shortly thereafter, the defendant walked over to his truck, which was parked at the rear of the bar, and returned with a gun. Davis further testified that the victim raised his hands, and the defendant fired a single gunshot towards the victim, returned to his truck, and fled the area.
Davis testified she only saw the defendant and the victim behind the bar at the time of the shooting. She further testified that the victim did not have a weapon. Contrary to Roden's testimony, Davis testified that by the time she and Roden exited the bar, the defendant's vehicle was already parked at the back. Davis did not see the defendant move the truck. He walked over to it, got the gun and returned.
Allen Keith Blanchard testified that he was a casual friend of the victim and a regular customer at Slippery Pete's. Blanchard testified he was present at the bar on the night of the shooting. He stated that, around 11:00 p.m., the victim told the defendant to leave the bar and walked him outside. Blanchard later exited the bar through the back door and noticed that there was a crowd of people arguing nearby. The victim instructed everyone to go back inside the bar. The crowd dispersed and the victim and the defendant started walking towards the area where the defendant's truck was parked. According to Blanchard, the defendant walked around, got into his truck and came out with a rifle. The unarmed victim responded by raising his hands up in the air. The defendant rushed over to the victim, placed the barrel of the gun against the victim's chest, and fired a shot. The victim fell to the ground and the defendant returned to his truck and drove away.
Blanchard denied ever assisting the victim in his efforts to remove the defendant from the bar. He also denied that he engaged in any type of altercation with the defendant on the night of the shooting. Blanchard testified he was positioned near the back door of the building throughout the incident. When the victim instructed everyone to go inside, he did not comply. According to Blanchard, he was the only other individual present during the shooting. He testified that he did not see Cardia, Roden, or Davis in the area at the time of the shooting, but he also testified that he saw Roden and Davis outside after the shooting. Blanchard also testified that he did not observe any tension or aggression between the defendant and the victim prior to the shooting. He explained that it appeared as though the defendant was about to leave and the victim was walking him to his car. Blanchard said he saw no reason for the defendant to shoot the unarmed victim. Blanchard testified he did not see anyone push the defendant down onto the ground.
Thomas "Tom" Franchuk, the victim's brother, testified that he was also at the bar on the night of the shooting. He explained that, at some point, he walked out of the back door and observed the victim telling the defendant to leave the premises. The victim was not yelling or behaving aggressively towards the defendant. He simply instructed the defendant to leave the premises. The defendant did not respond verbally. He walked toward his truck, got in and started backing out. He stopped near the back door of the bar and yelled, "We're all brothers." The victim walked inside and Tom walked over to the defendant's vehicle, touched him on the shoulder and told him to "just go sleep it off." However, Tom testified that the defendant did not appear to be intoxicated. Thereafter, according to Tom, the defendant left and he went back inside the bar.
Tom claimed he later walked outside and saw the victim with his cell phone out. The defendant had returned. According to Tom, he told the defendant to leave and advised that the victim was going to call the police. Tom testified that, even during this time, there was still no yelling or physical contact between the defendant and the victim. The victim advised that he had already contacted the police and instructed Tom to go back inside. Tom complied. After a while, however, Tom decided to go back outside to check on his brother. This time, he observed the victim leading the defendant to his vehicle. When the defendant refused to follow the victim's lead and attempted to walk in the opposite direction, the victim continued to guide him and insisted that the defendant walk as directed. There was no physical altercation and/or struggle between the defendant and the victim.
Tom admitted that, once the defendant refused to follow the lead and quickly turned toward the victim, he intervened and forcefully shoved the defendant down onto the ground. The victim prevented any further physical contact and instructed Tom to go back inside. Tom testified he did not comply. Shortly thereafter, an unidentified man approached Tom, punched him in the chest and asked why he pushed the defendant down. The victim also interrupted this physical encounter and told Tom and the unidentified man to "settle down." The victim again instructed Tom to go inside. This time, Tom complied.
Later, while inside the bar, Tom noticed that the defendant had again returned to the bar. He was seated at a table near the back door. According to Tom, he approached the defendant and told him he had to leave. When the defendant did not move, Tom stated he grabbed the defendant by the arm and escorted him out the door. Tom testified that he did not strike, push, or shove the defendant. He simply led him to the door. He claimed the defendant did not resist. He simply walked to the door and walked out. Tom returned to the inside of the bar. Tom testified he did not personally witness the shooting. He stated that he was still inside the bar when the shooting occurred. Once Cardia advised him that the victim had been shot, he ran outside and found the victim on the ground and the defendant in his truck driving away. Tom grabbed the tailgate of the defendant's truck and attempted to get in. His attempt was unsuccessful. The defendant drove away.
Tom denied ever hitting or kicking the defendant on the night of the shooting. He claimed he made physical contact with the defendant first, when he pushed him down, and finally, when he grabbed him by the arm and escorted him from the bar. He denied any further contact and/or physical altercation. He also testified that there was never a verbal altercation or any level of force between the defendant and the victim on the night of the shooting. Tom further testified that the victim was not armed with a gun on the night of the shooting. He also denied ever seeing the victim with a gun before.
Rhonda Goudeau, Commander of the Communications Division at the East Baton Rouge Parish Sheriffs Office, testified that the audio copies of the five calls the victim placed to the Sheriffs Department were authentic. The recordings of the calls were introduced into evidence and played in open court.
Dr. Gilbert Corrigan, an expert in forensic pathology, testified that he performed an autopsy on the victim. Based upon the damage to the skin and underlying fatty tissue surrounding the entry wound (caused by hot gases emitted from the gun), Dr. Corrigan opined that the victim was shot from a close distance. He described the victim's injury as "certainly a near contact wound if not a contact wound."
Dr. Charles Watson, a forensic scientist with the Louisiana State Police Crime Laboratory, testified that examination of the t-shirt the victim was wearing at the time of the shooting suggested that the gunshot was fired from a very close distance. Dr. Watson explained that the absence of gunpowder particles near the front hole was consistent with a contact or near contact gunshot. Dr. Watson further explained that "near contact" means a distance within ½ inch.
Detective Todd Morris, of the East Baton Rouge Parish Sheriffs Office, testified he was dispatched to investigate the shooting. He arrived on the scene approximately thirty minutes after the shooting. The victim had already been transported to the hospital.
Det. Morris testified that, after determining that the defendant was the suspected shooter, he received information indicating that the defendant's family was willing to assist in the investigation. Det. Morris went to an address identified as that of the defendant's father. At the residence, Det. Morris made contact with former Sheriffs Deputy Dale Hodges, the defendant's brother-in-law. Hodges contacted the defendant on his cellular phone and handed the phone to Det. Morris. According to Det. Morris, the defendant refused to disclose his location when asked and admitted to shooting the victim with "a full metal jacket." Det. Morris testified that the defendant did not indicate that the victim had a weapon or that he acted in self-defense in shooting the victim.
Det. Morris further testified that he conducted the video-recorded interview of the defendant after he was arrested, approximately seven hours after the shooting. According to Det. Morris, the defendant did not appear intoxicated at the time of the interview. During the interview, the defendant repeatedly stated that he did not remember what happened at Slippery Pete's. He stated that he recalled being pushed down and hitting his head on the ground. He claimed he then became so enraged that he "blacked out." Det. Morris testified that he did not observe any visible physical injuries to the defendant's face or head. The defendant's videotaped statement was introduced by the state and played at trial.
As previously noted, the defendant testified on his own behalf at the trial. The defendant testified that by the time he arrived at Slippery Pete's on the night in question, he had already consumed approximately six beers. At the bar, the defendant continued to drink and eventually became very intoxicated.
As he mingled in the bar, the defendant noticed that his ex-wife, Felicia Tridicio, and her husband, Andy Tridicio, were also inside the bar. In his testimony, the defendant explained that although he and Felicia had previously been involved in a lengthy custody battle and "were not on speaking terms," he decided that he would attempt to cordially converse with her and Andy. The defendant stated he had been paid a huge compliment by his employer that day and was in a very celebratory and jovial mood.
After socializing with Felicia and Andy for a while, the defendant left to dance with a female patron of the bar. Afterwards, he returned and continued to socialize with Felicia, Andy, and others in their party. The defendant testified that, shortly thereafter, an unidentified male approached and shoved him in the face, forcing him to fall off of the barstool upon which he was seated. The defendant concluded that the man was upset because the defendant danced with the female patron. The defendant testified that he was in a good mood, was enjoying the music, was making amends with his ex-wife, and simply wanted to have a good time, so he did not respond to the violence inflicted upon him by the unidentified male. Nevertheless, the defendant claims Cindy Cardia approached and asked him to leave. He reluctantly complied.
After walking outside to his truck, the defendant concluded he was too inebriated to drive. He claimed he returned to the bar and asked Andy to give him a ride home. The defendant explained that he did not want to jeopardize his employment as a crane operator and/or his impeccable driving record by driving under the influence. Andy agreed to take the defendant home later. Andy advised Cardia that he would be taking the defendant home and she agreed to allow the defendant to stay. Having secured a ride home and permission to remain at the bar, the defendant testified he then consumed more beer and a couple of glasses of whiskey.
The defendant testified that later, for no apparent reason, the victim approached and asked the defendant to leave. The defendant claimed the victim was very cordial as he walked him out of the back of the bar. Although he did not understand why he was being asked to leave, the defendant claimed he complied. He exited the bar and went to his truck, which was then parked near the northwest corner of the building. The defendant, still very intoxicated, sat inside the truck for a while trying to "sober up a little bit." Approximately 15 to 20 minutes later, the defendant decided he would attempt to drive home. As he backed out, the defendant hit the vehicle parked next to his. Still, he exited the parking lot. As he drove away, the defendant again concluded that his vision and coordination were too impaired to drive. He returned to Slippery Pete's and parked his truck at the rear of the bar.
The defendant testified he reentered the back of the bar to ask Andy if he would drive him home immediately. Meanwhile, the victim approached the defendant and told him to leave again. The defendant claimed he told the victim that he was simply too intoxicated to drive, but the victim replied, "Well, I. don't know what to tell you[.]" In response, the defendant claimed he exited the rear of the building once again. The victim followed the defendant out the door, but was not rude or hostile towards him.
The defendant testified he was determined to find someone to drive him home, so he decided to walk across the highway to Joe's Lounge. Unfortunately, there was no one at Joe's Lounge. The defendant then decided that he would again attempt to get Andy or someone at Slippery Pete's to drive him home. He walked back over to Slippery Pete's and entered through the back door again. According to the defendant, this time Tom Franchuk, Keith Blanchard and the victim approached him. Tom and Keith were "very excited" and verbally abusive as they demanded that the defendant leave the bar. The victim, on the other hand, simply told the defendant he had to leave again.
The defendant testified he was walking out the door and Tom forcefully shoved him into the wall. After he made it outside, Tom pushed him down onto the ground. The commotion caused a crowd to gather outside the bar. Attempting to diffuse the situation, the victim told everyone to go inside. According to the defendant, everyone complied except Tom. The defendant testified the victim told him again that he needed to leave and that the police had been called. The defendant claimed that as he was talking to the victim, Tom ran around the victim and tackled him to the ground. The victim yelled at Tom and demanded that he stop. The defendant claimed he eventually regained his composure and attempted to run away. However, when he lost his balance and fell, Tom started violently kicking him in his back and head. The defendant claimed eventually made it to his truck and attempted to get in and leave, but Tom pulled him back out of the truck by his belt. The defendant stated he was struggling to remain inside his vehicle when his hand touched his rifle. Fearing for his life, the defendant claimed he grabbed the rifle, turned it towards Tom and told him to "Get the `F' back." The defendant explained that he never intended to shoot Tom. He explained that he believed his life was in danger because Tom was violently beating him and his inebriated condition prevented him from adequately defending himself. The defendant claimed he simply wanted Tom to allow him to safely enter his vehicle and leave.
According to the defendant, Tom did not respond to the rifle like a normal person would have. Tom stood and looked at the gun as if he was preparing to move forward and grab it. The defendant claimed he then heard a loud yell from the area near the building. He immediately turned toward the sound and saw a semiautomatic pistol pointed directly at him. The defendant claimed he instantly reacted by firing his weapon. He stated he did not even know who was holding the pistol when he fired the shot. The victim stumbled backwards and fell to the ground. When Tom ran towards the victim, the defendant entered his vehicle and fled. The defendant claimed he was afraid Tom would arm himself with the victim's gun and come after him.
Regarding his statement to Det. Morris following his arrest, the defendant testified that he was previously diagnosed with "Combat Stress Related Post Traumatic Stress Disorder" as a result of his military combat service in Saudi Arabia. The defendant explained that this condition causes him to experience memory loss during periods of increased anxiety. He described these periods of memory loss as "blackout[s]." He further testified that once the stressful event has passed and his anxiety level decreases, he is able to gradually recall events that transpired during the "blackout" period. The defendant claimed he did not begin to recall the events of the shooting until approximately four or five days after his arrest.
Dr. Robert Maresh, a psychiatrist, testified that he had been treating the defendant, through Veterans Affairs, for post-traumatic stress disorder since November 2007.[2] The defendant's condition was a result of his military combat service. Dr. Maresh explained that individuals who suffer from post-traumatic stress disorder can experience periods of temporary memory loss when faced with stressful situations. Once the stressful situation has passed, Dr. Maresh explained, it is then possible for the individual to recall, in detail, things he could not remember before.
Tad Dickerson testified that he was present at Slippery Pete's on the night of the shooting. He had gone to the bar with Felicia and Andy to celebrate Andy's birthday. Tad testified regarding the defendant's interaction with the victim and Tom that night. According to Tad, the defendant was obviously intoxicated. His speech was slurred and he was wobbling as he walked. The defendant was initially asked to leave the bar after an unidentified individual pushed him off of a barstool. He subsequently was given permission to stay. Later, Tom approached and told the defendant to leave the bar. Tom started pushing the defendant and demanding that he leave. After the defendant walked outside, Tom pushed him really hard, causing him to hit his head on the rocks. Tad asked Tom to leave the defendant alone and advised that arrangements were already in place to take the defendant home. At this point, Andy, who had also watched the defendant being pushed around by Tom, stepped in and pushed Tom off of the defendant. Meanwhile, Blanchard attempted to approach, but Tad "held him away." Tad testified that he was not sure why Tom became violent towards the defendant.
Thereafter, the victim announced that he had called the police and instructed everyone to go inside. According to Tad, everyone went inside except the victim, Tom and the defendant. Shortly thereafter, Tad heard a shot outside. Tad explained he was not outside when the shot was fired. However, after the shooting, Tad ran outside and saw the defendant with a rifle in his hand and the victim on the ground. Tad attempted to provide medical assistance to the wounded victim. Tad denied seeing anyone else with a weapon that night. He also testified that he did not see anyone kick the defendant and he did not see anyone else "lay hands" on the defendant.
Andy and Felicia Tridico also testified on behalf of the defense. Felicia was the defendant's ex-wife and Andy was Felicia's current husband. Both witnesses testified that the defendant was highly intoxicated on the night in question and he was asked to leave the bar several times. The defendant left the bar and returned several times. Felicia testified that on the last time the defendant returned to the bar, the victim was escorting him back out when Tom and Blanchard became involved. Tom pushed the intoxicated defendant down as he walked towards the door. Tom also pushed the defendant down again outside. The victim asked Tom to discontinue the physical contact with the defendant. Andy also fought to keep Tom away from the defendant. Tom aggressively tried to attack the defendant. According to Felicia, Tom inadvertently struck her while attempting to strike the defendant. Later, after the victim instructed everyone to go inside, Felicia stated she looked out the back door and saw Tom chasing and beating the defendant. Blanchard was no longer outside.
Andy testified that once he saw Tom push the defendant inside the bar, and he observed Blanchard standing nearby "cracking his knuckles" and adjusting his shirt as if he was preparing to fight, he decided that he would not allow the men to take advantage of the intoxicated defendant. He told Felicia, "as much trouble as we have had with this guy, I am not going to let him get out there and get his brains beat out." Andy and Felicia walked outside in time to see the defendant being pushed head-first onto the ground. Andy testified that although the defendant's truck was parked at the back of the building, Tom kept forcing him towards the road, stating "get the F' out of here." Andy stated he and Felicia told Tom that the defendant's car was parked at the back. Tom did not respond; he kept pushing and hitting the defendant. Andy positioned himself between the defendant and Tom to stop the shoving. Blanchard was circling around Andy like he was preparing to strike him. Tom continued to try to hit the defendant. Andy reached out, stopped Tom's hands and stated, "1 am not drunk... you are not going to do this to me." Andy verbally scolded Tom for "beating up on a drunk." According to Andy, Tom was beating the defendant and the defendant was so intoxicated he did not even attempt to fight back.
Throughout this encounter, the victim repeatedly indicated that he would handle the situation and asked everyone to go inside. After Felicia was inadvertently struck by Tom, Andy decided to discontinue any involvement in the matter. He and Felicia went back into the bar. According to Andy, Felicia remained near the back door. Through the door, Felicia observed Tom chasing the defendant to his truck and advised Andy of this observation. No longer wanting to be involved, Andy told Felicia to get out of the door. Felicia complied. Moments later, a shot was fired. Andy explained he immediately thought they had killed the defendant.
Andy also testified that the victim had a gun on him that night. Andy explained that every time the victim approached to deal with the defendant, he had his hand inside his jacket on the gun. Andy stated he personally observed the handle of the gun in the victim's jacket pocket. He claimed that earlier that day he asked Cindy Cardia why the victim was armed with a gun. Cardia hesitantly replied, "It's a tough place." In her testimony, Cardia admitted that Andy asked her about the victim carrying a gun. However, she claimed she told Andy that the victim did not carry a gun.
Ricky Ryback testified that he was a regular customer at Slippery Pete's. He patronized the bar approximately two or three times a month but he was not present on the night of the shooting. Ryback testified that on previous occasions he personally observed the victim carrying a gun at the bar. He further testified that the victim was known by some people in the community as "Pistol Pete."
In finding the defendant guilty of second degree murder, the trial court made the following factual findings:
As the trier of fact and after listening to all of the witnesses, observing their demeanor on the stand, their ability to recall what they say or say they heard or saw what position they were in to actually see and hear what they said they saw and heard, the court is convinced of the following facts: Kyle Spring was told to leave in no uncertain term[s] at least three times, but he kept returning time after time. He was intoxicated to a certain degree, but clearly knew what he was doing, and what was going on. While Bill Franchuk was being very reasonable and diplomatic in getting the defendant to leave he was verbally forceful, and he was stating his position very clearly as could be heard on the tape, "Get out of here," he said on several occasions. He was not calm and just had his arm around him all night. He was getting pretty confrontational with him, because he wanted him to leave. 1 am convinced that the defendant was handled roughly by Tom Franchuk and probably Keith Blanchard. This clearly exacerbated an already volatile situation. I am convinced that Kyle Spring was finally leaving, still very reluctantly. When he got to his truck he saw the rifle he may or may not have remembered was there. He took the rifle out, he pointed it at Bill Franchuk who had been trying to get him to leave all night and was making up for all of the humiliation he felt that night, and said to Bill Franchuk, "Now what? Now what?" Bill Franchuk put up his arms trying to calm the defendant down walking backwards, the defendant walking towards him, and when the defendant was within inches of Bill Franchuk he fired one shot into his abdomen. Perhaps the alcohol, the hostility shown towards him previously all came together and he shot him, The court finds that the victim did not have a weapon, and there was no provocation by the victim at all. The defendant then walked back to his truck, put the gun in the truck, and drove off. He drove to Livingston Parish without incident or accident. He spoke to Detective Morris on the phone that was handed to him by his brotherin-law, Dale Hodges, the defendant's brother-in-law and he said when asked to come in, "are you crazy? I'm not doing that." And then he responded, "Is the guy dead? I shot him with four or full metal jacket, it probably went right through him." He knew exactly what he had done, never said the guy had a gun, or the guy tried to kill me.
On appeal, the defendant does not contest the existence of specific intent to kill. Specific intent to kill can be easily inferred from the fact that the defendant aimed the high velocity assault rifle directly at the victim, at close range, and pulled the trigger. See State v. Wallace, 612 So.2d 183, 190 (La. App. 1st Cir. 1992), writ denied, 614 So.2d 1253 (La. 1993). The defendant argues, however, that the homicide was justifiable because he acted in self-defense to avoid being shot by the victim. The defendant asserts that the single shot was fired in response to his belief that he was in imminent danger of losing his life when the victim pointed a gun at him.
The fact that an offender's conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. La. R.S. 14:18. Louisiana Revised Statutes 14:20 provides, in pertinent part:
A. A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.
When the defendant in a homicide prosecution claims self-defense, the state must prove beyond a reasonable doubt that the homicide was not committed in self-defense. State v. Williams, XXXX-XXXX, pp. 5-6 (La. App. 1st Cir. 12/28/01), 804 So.2d 932, 939, writ denied, XXXX-XXXX (La. 2/14/03), 836 So.2d 135. For the defendant's actions to be justified, the force used must be reasonable under the circumstances and apparently necessary to prevent an imminent assault. State v. Nelson, 34,077, p. 6 (La. App. 2d Cir. 12/6/00), 775 So.2d 579, 584. On appeal, the relevant inquiry is whether or not, after viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found beyond a reasonable doubt that the defendant did not act in self-defense. State v. Fisher, 95-0430, p. 3 (La. App. 1st Cir. 5/10/96), 673 So.2d 721, 723, writ denied, 96-1412 (La. 11/1/96), 681 So.2d 1259.
Clearly, the determination of the defendant's guilt or innocence in this case was contingent upon the court's credibility assessment of the individuals claiming to be eyewitnesses to the shooting and/or events immediately preceding the shooting. After hearing conflicting evidence regarding whether the victim was armed at the time of the shooting, the court rejected the defendant's claim of self-defense and found that the victim was unarmed. The court concluded that the testimony of the state's witnesses, indicating that the unarmed victim held his hands in the air when the defendant pointed the gun towards him, was more credible than that of the defendant and/or the defense witnesses.
When there is conflicting testimony about factual matters, the resolution of which depends on the determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The determination of what weight to give the evidence rests solely within the discretion of the trier of fact, who is free to accept or reject, in whole or in part, the testimony of any witness. State v. Johnson, 529 So.2d 466, 473 (La. App. 1st Cir. 1988), writ denied, 536 So.2d 1233 (La. 1989). The appellate court is constitutionally precluded from acting as a thirteenth juror in assessing what weight to give evidence in criminal cases; this is within the discretion of the trier of fact. State v. Mitchell, 99-3342, p. 8 (La. 10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence which conflicts with the testimony accepted by the trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Quinn, 479 So.2d 592, 596 (La. App. 1st Cir. 1985). Considering the factual finding that the victim was unarmed, the trial court's conclusion that the killing was not necessary to preserve the defendant's life was reasonable. Moreover, the defendant's refusal to surrender when Det. Morris requested that he do so is also inconsistent with a theory of self-defense.
We now turn to the defendant's alternative argument. The defendant argues that the evidence, at best, supports a conviction of manslaughter.
Manslaughter is a proper responsive verdict for a charge of second degree murder. La. Code Crim. P. art. 814(A)(3). Louisiana Revised Statutes 14:31(A)(1) defines manslaughter as a homicide which would be either first degree murder or second degree murder, "but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." Additionally, "[provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]" La. R.S. 14:31(A)(1). The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are factors in the nature of mitigating circumstances that may reduce the grade of homicide. State v. Crochet, 96-1666, pp. 9-10 (La. App. 1st Cir. 5/9/97), 693 So.2d 1300,_1307, writ denied, 97-1547 (La. 11/21/97), 703 So.2d 1305. Provocation is a question of fact to be determined by the trier of fact. Thus, the issue remaining is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence. State v. Harris, 97-0537, p. 11 (La. App. 1st Cir. 2/20/98), 708 So.2d 1169, 1176, writ denied, 98-0758 (La. 9/4/98), 723 So.2d 434. The defendant has the burden of proving these mitigating factors by a preponderance of the evidence. State v. Riley, 91-2132, p. 11 (La. App. 1st Cir. 5/20/94), 637 So.2d 758, 763.
In this case, the defendant argues that the evidence presented at trial established that the mitigating factors of sudden passion and heat of blood were present under the facts and circumstances of this case. The defendant argues that the severe beating inflicted upon him by Tom Franchuk created sudden passion or heat of blood sufficient to cause the defendant, or any ordinary individual under similar circumstances, to lose self-control and cool reflection.
The reasons for the conviction in this case reflect that the trial court, while aware of the physical altercation between the defendant and Tom and other circumstances surrounding the shooting, concluded this was a case of second degree murder and rejected the possibility of a manslaughter conviction. Although the defendant's version of the events, as provided in his trial testimony, arguably suggests sudden passion or heat of blood caused by involvement in the physical altercation with Tom, the testimony of the state's witnesses, whom the trial court specifically found to be credible, established that the defendant did not pull the trigger immediately upon directing the weapon at the victim. This fact, as accepted by the trial court, indicates that the defendant had time for self-reflection. Before firing the single gunshot at the victim, who did nothing to provoke him, the defendant paused, and asked, "Now what? Now what?" Regarding the defendant's claim that he had no reason to shoot the victim, it is worth noting that while the witnesses testified that the victim's demeanor and interaction with the defendant on the night of the shooting remained calm and cordial, the trial court noted in its reasons for judgment that the evidence showed that the victim was reasonable but verbally forceful with the defendant. In the recordings of the calls the victim placed to the Sheriffs Department, the victim can be heard telling the defendant to "Get out of here[.]" The victim's voice on the recordings reflects a degree of force and frustration. The facts and circumstances of the shooting, as determined by the trial court, indicate that the defendant acted with deliberation and reflection after having been forcefully expelled from the bar and humiliated by the staff at Slippery Pete's. "If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act." State v. Leger, XXXX-XXXX (La. 7/10/06), 936 So.2d 108, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007).
Considering the foregoing, we are convinced that a rational trier of fact, viewing all of the evidence in the light most favorable to the prosecution, could have concluded that the state proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of second degree murder, that he did not kill the victim in self-defense, and that the mitigatory factors were not established by a preponderance of the evidence.
Accordingly, this assignment of error lacks merit.

DENIAL OF MOTION FOR A NEW TRIAL AND NEWLY DISCOVERED EVIDENCE
By this assignment of error, the defendant contends the trial court erred in denying his motion for a new trial despite new evidence to corroborate his trial testimony regarding the fact that on the night in question, he tried to leave the area but Tom forcefully pulled him out of his truck and continued beating him, and also that the victim pulled out a gun and threatened to shoot the defendant. He argues that, in deciding the new trial motion, the trial court erroneously weighed the new evidence as though he was "a jury determining guilt or innocence," instead of simply ascertaining if the new evidence was "material evidence fit for a new jury's judgment."
La. Code Crim. P. art. 851, which sets forth the grounds for seeking a new trial, provides in pertinent part:
The court, on motion of the defendant, shall grant a new trial whenever:
...
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
Thus, in order to obtain a new trial based on newly discovered evidence, the defendant has the burden of showing: (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it probably would have produced a different verdict or judgment of guilty. State v. Smith, 96-0961, p. 7 (La. App. 1st Cir. 6/20/97), 697 So.2d 39, 43.
At a hearing on the motion for a new trial in this case, Donald Russell testified he patronized Slippery Pete's on the night in question. He arrived around 9:00 p.m. Russell testified that, at sometime around midnight, an altercation arose towards the rear of the bar. From his seat near the front of the bar, Russell observed people arguing and shoving at the back door. Russell decided it was time for him to leave. By the time Russell exited the bar and headed towards his car, the commotion had moved outside. Russell observed the victim telling everyone to go inside. He also saw the defendant get "tackled" by another man as he stood arguing with the victim. According to Russell, the man threw the defendant onto the ground and started punching and kicking him. Russell testified that the victim joined in and hit the defendant once or twice. The defendant got up from the ground and attempted to run away. The other guy ran after the defendant. The defendant fell down and the guy started kicking and hitting him again. Meanwhile, the victim, who appeared to be out of breath, walked around the building. Russell stated that the defendant got up and ran to his vehicle. He attempted to get into his vehicle and the guy who had been beating him grabbed him and tried to pull him out of the vehicle. The defendant pulled out a rifle and told the guy to back up. The guy backed up a little bit. The victim appeared with a gun and told the defendant, "if you don't put the gun down 1 am going to shoot you." The victim then proceeded to walk towards the defendant repeatedly threatening to shoot the defendant if he did not put his weapon down. Russell claimed the defendant never walked towards the victim before pulling the trigger of his rifle.
Russell testified that he left the bar immediately after the shooting occurred. Russell explained that he had an outstanding warrant and did not want to be there when the police arrived. He was not there when the police arrived and he did not speak to anyone during the investigation of the matter.
Russell explained he recently came in contact with the defendant while they were housed on the same line at the Parish Jail. Russell mentioned to another individual that the defendant looked familiar. He later learned that the defendant had been convicted of killing the victim at Slippery Pete's. Russell advised the defendant that he was at the bar the night of the shooting. The defendant apparently related this information to his attorney, who in turn, sent Russell a letter asking if he had any information about the night of the shooting at Slippery Pete's. Russell wrote back detailing what he witnessed. Russell claimed that later, in a conversation about the shooting, the defendant indicated that he did not agree with all of the details provided by Russell. Russell claimed he told the defendant that he was simply telling him what he observed.
At the conclusion of the hearing, the trial court denied the motion for a new trial specifically finding that the evidence sought to be introduced by the defense would not have changed its previous opinion and assessment of the evidence presented during the trial. The defendant seeks review of this ruling.
In support of his claim that the trial judge erred in failing to only ascertain whether the new material was fit for a new trier of fact, the defendant cites State v. Prudholm, 446 So.2d 729 (La. 1984) and Smith, 96-0961, 697 So.2d 39.
Although there is language in these cases (both involving a new trial motion following a jury trial) that suggests the scope of the trial judge's duty on a motion for new trial based upon newly discovered evidence is limited to ascertaining whether there is new material fit for a new jury's judgment, the language of Article 851(3) also requires an evaluation of the effect of the newly discovered evidence. In State v. Watts, XXXX-XXXX, pp. 8-9 (La. 1/14/03), 835 So.2d 441, 448-49, the supreme court noted:
When ruling on an Article 851(3) motion, a trial judge's duty is not to weigh the new evidence as though he were a jury deciding guilt or innocence or to determine what is true or false in light of the additional information. In other words, the trial judge is not to assess the newly discovered evidence as though he were a thirteenth juror.... [T]he trial judge should not weigh the new evidence as if he or she were a jury deciding guilt or innocence ... but should ascertain whether there is new material fit for a new jury's judgment. The only issue is whether the result will probably be different. (Emphasis added).
Thus, it is clear that the issue of whether new evidence is fit for a new jury cannot be considered in isolation. The question must be considered in light of the Article 851(3) provision that the new evidence would probably have changed the result of the first trial. The judge must evaluate the effect of the new evidence. See Watts, XXXX-XXXX at p. 9, 835 So.2d at 449. "It is appropriate to be skeptical when newly discovered evidence is offered after a trial. Such evidence must be thoroughly and cautiously scrutinized." Watts, XXXX-XXXX at p. 14, 835 So.2d at 453.
In this case, the defendant cites Prudholm in support of his claim that the trial judge erred in considering the credibility of Russell's testimony. However, we note that, in upholding the denial of the motion for a new trial in Prudholm, the supreme court held that since there were no special circumstances which would suggest that the witness's recantation was "truthful," the trial judge, in deciding the new trial motion, reasonably could have concluded that the recantation would not have created a reasonable doubt of guilt in the mind of any reasonable juror. Prudholm, 446 So.2d at 736-37. Thus, the court acknowledged that the trial court was within its discretion in considering the credibility of the new evidence when evaluating its effect.
In State v. Ybarzabal, 180 La. 653, 157 So. 379 (1934), the Louisiana Supreme Court considered the impact of newly discovered evidence in a motion for new trial after the defendant had been convicted in a bench trial. There, as in the instant case, the newly discovered evidence conflicted with other evidence introduced at trial, and the credibility of the newly discovered evidence had a significant impact on the court's decision on whether the new evidence was fit for a new trier of fact's judgment. After concluding there was nothing arbitrary or unreasonable in the judge's determination that the testimony of the two alleged newly discovered witnesses would not affect his judgment of the defendant's guilt, the court noted that, "A judge is allowed more discretion in that respect in a case that must be tried by him alone than in a case that is tried by a jury, because, on the hearing of a motion for a new trial, the judge knows whether the alleged newly discovered evidence would affect his judgment far better than he could know whether it would affect the verdict of a jury." Ybarzabal, 157 So. at 380.
After a careful review of the record, we find no abuse of discretion in the trial court's denial of the defendant's motion for a new trial based upon newly discovered evidence. There was nothing arbitrary or unreasonable in the judge's concluding that the testimony of the newly discovered witness would not affect his judgment of the defendant's guilt, if a new trial should be granted. Ybarzabal, 157 So. at 380. While Russell's testimony would have corroborated the defendant's claim that the victim was armed with a weapon, the testimony also contradicted the defendant's own trial testimony and the testimony of all of the other state and defense eyewitnesses in a major way. At the hearing, Russell testified that the victim argued with the defendant and actively participated in beating the defendant. However, the defendant and everyone else who claimed to have witnessed the incident testified that the victim was not aggressive or confrontational with the defendant at any time that night. The defendant and others further testified that the victim was not involved in the physical altercation and he did not strike the defendant.
Considering the foregoing, we find the defendant did not sustain his burden of showing that Russell's testimony would probably have produced a different result than a judgment of guilty at a new trial. The trial judge, who sat as the trier of fact in this case, heard the evidence on the motion for a new trial and specifically concluded that the evidence, if presented at the trial, would not have changed his judgment of guilty. The trial court's denial of a motion for new trial will not be disturbed absent a clear abuse of discretion. State v. Maize, 94-0736, pp. 27-28 (La. App. 1st Cir. 5/5/95), 655 So.2d 500, 517, writ denied, 95-1894 (La. 12/15/95), 664 So.2d 451. Considering all of the evidence presented at the hearing and taking into consideration the trial court's specific credibility determinations and the testimony presented at the trial, it was not shown that an injustice resulted from denial of the defendant's request for a new trial.
This assignment of error also lacks merit.

DECREE
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
PARRO, J., concurring in part.
I agree with the affirmation of the conviction and sentence in this case. However, with respect to the conclusion reached in the analysis regarding the denial of the motion for new trial based on newly discovered evidence, I concur.
In light of the Louisiana Supreme Court's analysis in State v. Watts, 00-0602 (La. 1/14/03), 835 So.2d 441,1 believe the trial judge fell into legal error when he evaluated the new evidence from his own perspective as the trier of fact on the merits of the case. However, I also believe that if the evidence had been introduced at the trial, it would not have changed the judgment of guilty in light of the entirety of the evidence in this matter. For these reasons, I respectfully concur.
NOTES
[1] During the trial, several other witnesses referred to the victim as a co-owner of Slippery Pete's. Cardia testified, however, that she was the sole owner of the bar and the victim only worked there.
[2] It is worth noting that, according to his testimony, Dr. Maresh's treatment of the defendant began approximately one year after the shooting in this case. There is no evidence that the defendant was undergoing treatment at the time of the incident.